196 N.J. Super. 34 (1984)
481 A.2d 563
IN THE MATTER OF THE COMMITMENT OF J.L.J. IN THE MATTER OF THE COMMITMENT OF J.D.M. IN THE MATTER OF THE COMMITMENT OF W.J.
Superior Court of New Jersey, Appellate Division.
Argued May 30, 1984.
Decided August 31, 1984.
*37 Before Judges MATTHEWS, J.H. COLEMAN and GAULKIN.
Laura M. Le Winn, Acting Director, Mental Health Advocacy, argued the cause for appellant J.L.J. (Joseph H. Rodriguez, Public Advocate, attorney; Richard I. Friedman, Assistant Deputy Public Advocate, of counsel and on the brief).
Anderson D. Harkov, Assistant Deputy Public Defender, argued the cause for appellant J.D.M. (Joseph H. Rodriguez, Public Defender, attorney).
Harvard Hollenberg, Deputy Public Advocate, argued the cause for appellant W.J. (Joseph H. Rodriguez, Public Advocate, attorney).
Stephen H. Skoller, Assistant Prosecutor, argued the cause for respondent State of New Jersey in A-882-83T5 and A-1648-83T5 (George L. Schneider, Essex County Prosecutor, attorney; Marc J. Friedman, Assistant Prosecutor, of counsel).
Ulrike Ziebarth, Assistant Prosecutor, argued the cause for respondent State in A-5165-82T5 (Larry J. McClure, Bergen County Prosecutor, attorney; Anthony Alfano, Assistant Prosecutor, of counsel and on the letter brief).
PER CURIAM.
These are appeals by three former defendants found not guilty by reason of insanity (NGI) of their respective crimes *38 and thereafter committed to institutions. Each defendant appeals from the determination of his latest Krol[1] hearing denying him transfer to a lesser restrictive environment than that which he presently enjoys.
J.L.J.
On March 18, 1982, J.L.J. was found not guilty by reason of insanity of arson, murder and aggravated assault occurring on April 15, 1981. On March 18, 1982, the court ordered J.L.J. committed pursuant to State v. Krol, 68 N.J. 236 (1975), State v. Fields, 77 N.J. 282 (1978) and N.J.S.A. 2C:4-8.
J.L.J. was confined to the Forensic Unit (Vroom Building) of Trenton Psychiatric Hospital until August 12, 1982. He was then transferred to the Intensive Treatment Unit at the hospital, where he continued to be confined under a succeeding court order dated February 3, 1983.
On July 15, 1983, a hearing was held to review J.L.J.'s commitment to the Intensive Treatment Unit at the Trenton Psychiatric Hospital. The State presented Dr. Howard S. Blechman, the psychiatrist in charge of appellant's unit to testify as to J.L.J.'s condition. J.L.J. presented Dr. Seymour Kuvin, an independently retained psychiatrist, to testify on his behalf.
Dr. Blechman testified that he has been familiar with appellant since August 1982 and has talked with appellant many times. J.L.J. was diagnosed as showing no overt signs of psychosis, having a history of paranoid schizophrenia in fair remission, and having a history of alcohol and marijuana abuse. He was characterized as being a very low profile individual who rarely speaks. He is difficult to interview and only answers direct questions, with minimal response. When answers are given, they are often vague or inconsistent with previous information. Dr. Blechman also testified that appellant's insight is *39 fair at best, possibly impaired, and expresses a flatness of affect.
J.L.J. is receiving 50 milligrams of Prolixin Decanoate, a long acting anti-psychotic agent, often used for the treatment of schizophrenia, every two weeks. He also receives 100 milligrams of Tofranil, an anti-depressant, at bedtime and 2 milligrams twice a day of Cogentin, to ease the side effects of the Prolixin. If taken off of this program of medication, Dr. Blechman testified that the statistical chance of recurrence of acute schizophrenic breakdown would be quite high, within a few weeks or a few months.
In regards to theraputic programs, Dr. Blechman stated that J.L.J. is unmotivated and his responsiveness is minimal. He does not go to all available programs and must be prodded and reminded to attend those he does attend. His main problem was deemed not to be bad behavior, but rather that he is unmotivated to do positive things, he only goes through the motions.
Dr. Blechman was uncertain as to whether he would be a danger to society. However, Dr. Blechman would not recommend that J.L.J. be released from the facility into the community. J.L.J. now has level 3 privileges, and would normally be recommended to the less restrictive level 4 shortly.[2] The judge had ordered that J.L.J. be given no greater level of privileges unless he received a written report from the staff requesting such an increase and could review the same. The I.T.U. staff seemed reluctant to move formally in the face of a court order when the patient himself, who "never makes waves," doesn't ask for it. Dr. Blechman requested that the court allow the *40 I.T.U. staff to grant level 4 or 5 privileges when the staff felt it was warranted, or to transfer J.L.J. to the Tri-County Unit with a less intensive level of treatment.
Dr. Kuvin has known J.L.J. since 1981, prior to his criminal trial, and has met with him three times. He found no evidence of present schizophrenia; J.L.J.'s thought associations were intact, although his answers were terse. Although he wouldn't volunteer information or maintain a conversation, his replies were concrete. J.L.J.'s insight as to how he affected others appeared to be intact, but generally speaking, he was expressionless.
Dr. Kuvin agreed with counsel's characterization of J.L.J. as one who would do something if taken by the hand and told `do this.' He did not believe J.L.J. to be a danger to himself or others, and stated that his present restrictions are a waste of time, money and effort. Dr. Kuvin recommended that he be discharged under close supervision or transferred to an open ward at the Tri-County Unit.
On the basis of the proofs and testimony before the court, the judge found by a preponderance of the evidence that there had been no material changes in J.L.J.'s mental condition, or the degree of potential dangerousness which would warrant a relaxing of the present restraints upon his liberty. The judge also ordered that the same level of privileges be continued and that no greater levels be allowed until written request by the hospital staff.
J.D.M.
J.D.M. was found not guilty by reason of insanity of automobile theft on March 5, 1979 and ordered committed to Greystone Park Psychiatric Hospital. At periodic review hearings on June 20, 1979, October 24, 1979, and May 6, 1980 he was returned to Greystone.
A further Krol hearing was conducted on May 29, 1981, and by order of June 15, 1981 J.D.M. was placed in the least restrictive level of Program C at Greystone, pending approval *41 and acceptance in a transitional residence, to which he would be conditionally released.
As a result of a June 1982 hearing, J.D.M.'s commitment was ordered continued and he was to enjoy all privileges he had had prior to the hearing.
On October 7, 1982, on the advice of his treating physician, J.D.M. filed a notice of motion for an order granting off-grounds employment privileges. The motion was later withdrawn on the advice of the same physician.
J.D.M.'s most recent Krol hearing was held June 16, 1983. J.D.M.'s clinical psychiatrist, Dr. Paul Valvo, was the only witness to testify. Dr. Valvo has been his psychiatrist for four to five years, and has contact with J.D.M. on a daily basis.
Dr. Valvo testified that J.D.M. is a chronic schizophrenic in partial remission. He is nervous but friendly when interacting with other people. His ability to handle stress has improved to the point where he accepts any restrictions imposed on him and cooperates with his treatment team. Dr. Valvo noted that J.D.M. usually obeyed any rules or restrictions imposed, but at times did not have the clear judgment to understand that he should not leave the premises, even to go next door for a pizza. J.D.M.'s actions do not result from evil intentions, but because he does not know any better.
Dr. Valvo testified that J.D.M. does not present a danger either to himself or to others, and that he has not shown any aggressive or violent behavior. Presently, J.D.M. receives injections of Prolixin Decanoate, an anti-psychotic. Without the drug, Dr. Valvo testified, J.D.M.'s behavior would regress and he might "engage in something irresponsible like he did before," i.e., stealing a car.
J.D.M. is currently in a transitional unit at Greystone Park with off-grounds employment privileges, and periodically visits the Community Mental Health Center. His doctors had moved for an order allowing this in October 1982, but after an incident in which he had one or two beers, they withdrew their motion. *42 It is unclear from the transcript and briefs whether there occurred one or two incidents of rule violations with regard to alcohol in the last year. However, Dr. Valvo's 1982 psychiatric report referred to by the judge seems to pinpoint a problem of alcohol abuse. When asked what effect alcohol had in reaction with J.D.M.'s medication, Dr. Valvo replied that alcohol is a powerful drug which affects the central nervous system, which in combination with a powerful anti-psychotic can produce serious effects.
On the basis of all the foregoing, the judge declined to discharge J.D.M. from his Krol status. Dr. Valvo recommended a six-month testing period to monitor J.D.M.'s adjustment ability. He seemed to indicate that the Bergen County transitional facilities outside of Greystone would not accept J.D.M. into their program unless he were released from Krol status. The judge pointed out that if J.D.M. were released, neither the court nor the psychiatrists would have any further authority to supervise him while, according to the doctor, he was still in need of supervision.
W.J.
W.J. has a history of prior treatment for mental illness. He was seriously wounded on April 7, 1980 during the course of his arrest for murder and aggravated assault, in connection with the shooting deaths of his parents. Found not guilty by reason of insanity on September 1, 1981, that same day he was committed pursuant to State v. Krol.
W.J. was confined in the Vroom Building from September until December 1, 1981, when the court ordered his transfer to a locked ward at the Tri-County (Civil) Unit of Trenton Psychiatric Hospital. After he apparently took some keys, he was transferred to the Intensive Treatment Unit on August 2, 1982. He also obtained keys while there, and assaulted another patient who informed on him. W.J. was administratively transferred back to the Vroom Building August 30, 1982. After a *43 hearing on October 1, 1982, the court affirmed the administrative transfer and ordered his continued confinement in Vroom.
On January 21, 1983, W.J.'s motion to be transferred to a less restrictive setting was denied.
W.J.'s latest commitment review hearing was held on September 30, 1983. Dr. Eva Short, staff psychiatrist at the Vroom Building, was the only witness called to testify.
Dr. Short has been treating W.J. for over one year, since his last transfer to Vroom. Her testimony was based on W.J.'s record, over a dozen sessions and several interviews in preparation for her court appearance.
W.J., a 28-year old male, suffers from schizophrenia, paranoid type. He began having delusions while he was in college and has been hospitalized twice since then. Under the influence of these delusions, he killed his biological parents. After commitment he was put on Prolixin, and has continuously improved. Approximately two months before the last hearing, W.J. was taken off Prolixin due to the side effects he suffered from the medication. At that time he regressed and began having delusions again. Once back on medication, the delusions disappeared.
As to his present condition, Dr. Short stated: "His reality testing is good. He is well oriented. He is not suffering from delusions or hallucinations at this time. Unfortunately, one can't say that he is cured but I think he's in a good  relatively good state of remission at this time."
In the Vroom Building between 1982 and 1983, W.J. has not shown any aggressive behavior, nor has he expressed any wish to escape. When asked, Dr. Short postulated that if he were taken off all medication and hospital supervision, according to his history, he would be a danger to society. Based on last year's behavior, however, she recommended that he be placed in a locked ward, with constant supervision, that was less restrictive than the Vroom Building, e.g., I.T.U. or Tri-County. She testified that W.J. is presently motivated to behave to earn *44 the right to fewer restrictions, and that containing him in maximum security may have an ill effect upon him.
The judge declined to move W.J. from the maximum security of the Vroom Building. He focused on W.J.'s prior history of escape attempts and the fact that W.J.'s delusions reoccurred recently when he was taken off medication. The judge observed that while W.J. is on medication in a "standard environment such as the Vroom Building," there are no problems. He concluded that if W.J. was not in a "standard setting" like the Vroom Building, "this man is not going to take his medication ... and he's going to attempt to escape."
W.J. contends that a Krol patient has a constitutionally protected liberty interest in the least restrictive conditions necessary to achieve the purposes of treatment. Although the State does not attempt to address this issue, we agree with W.J. There is, however, another side to the equation: The State has a legitimate interest in the protection of society and the individual.
In Youngberg v. Romeo, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the United States Supreme Court held that involuntarily committed mentally retarded individuals had a constitutionally protected liberty interest under the Due Process clause of the Fourteenth Amendment to reasonable safety and freedom from bodily restraint (e.g. shackles or `soft' restraints). 457 U.S. at 320, 102 S.Ct. at 2460. To determine whether a substantive right has been violated, a court must balance the individual's liberty interest against the State's reasons for restraining that liberty. Id. at 320, 102 S.Ct. at 2460. Under the circumstances of Youngberg, courts are required to give deference to the exercise of professional medical judgment, rather than specifying which professionally acceptable choice should have been made. Id. at 321-322, 102 S.Ct. at 2461.
The Third Circuit has interpreted Youngberg as holding that a State may not restrain residents of institutions for the retarded *45 or the mentally ill except when and to the extent that professional judgment deems necessary for the reasonable safety of residents and personnel within such institutions, or to provide needed training or treatment. Scott v. Plante, 691 F. 2d 634, 638 (3 Cir.1982).
Scott was found incompetent to stand trial for the murder of his grandmother, and was confined to the Vroom Building in 1955. After several rounds in the federal courts beginning in 1973, the United States Supreme Court remanded the case to the Third Circuit Court of Appeals for reconsideration in light of Youngberg. Plante v. Scott, 458 U.S. 1101, 102 S.Ct. 3474, 73 L.Ed.2d 1362 (1982). That court in turn remanded to the Federal District Court of New Jersey for fact findings in consideration of Scott's claim for reassignment to a less restrictive setting in the Trenton Psychiatric Hospital. Scott v. Plante, 691 F.2d at 638. No further proceedings have been reported.
A liberty interest protected by the Due Process Clause of the Fourteenth Amendment may arise out of State law. Vitek v. Jones, 445 U.S. 480, 488-490, 100 S.Ct. 1254, 1261-1262, 63 L.Ed.2d 552 (1980).
According to State v. Krol, the State must prove that there exists a substantial risk of dangerous conduct within the reasonably foreseeable future to justify the NGI's involuntary commitment. 68 N.J. 236, 260 (1975). Once the court has determined that the defendant is mentally ill and dangerous to himself or others, it must impose that degree of restraint necessary to reduce the risk to an acceptable level. 68 N.J. at 261. While doubts must be resolved in favor of protecting the public, the court should not infringe on the defendant's liberty anymore than appears reasonably necessary. 68 N.J. at 261-262.
N.J.S.A. 2C:4-8b(3) mandates that all NGIs found too dangerous to be released without supervision shall be committed to an approved facility, thereafter to be treated as a person civilly *46 committed. Our Supreme Court has determined that NGIs possess the same right to automatic periodic review of their commitment as do civil committees. State v. Fields, 77 N.J. 282, 293 (1978). All patients civilly committed as dangerous to self or others are entitled to "the least restrictive conditions necessary to achieve the purposes of treatment." N.J.S.A. 30:4-24.2e(2). Further, the State must bear the ultimate burden of proof in justifying any continued restrictions on NGIs at each periodic review by establishing that such restrictions currently meet the Krol criteria for the initial imposition of restraints. State v. Fields, 77 N.J. at 293.
Our Supreme Court has recently had to determine the legal status of individuals who no longer meet the standards for civil commitment but still require some custodial care, and the procedures necessary to protect their legal rights. In re S.L., 94 N.J. 128 (1983). Individuals in such a position are considered "discharged pending placement" in the community (DPP's). 94 N.J. at 131. Because the State necessarily retains substantial control over the individual's life and liberty in the process of arranging for appropriate placement, the individual's rights must be protected by procedures designed to minimize restrictions on that liberty. These restrictions must be related to the underlying purpose of confinement, i.e., to insure a safe and orderly transition into an appropriate setting least restrictive of liberty. 94 N.J. at 140. If immediate placement is not possible, the individual must be placed in the environment within the institution least restrictive of his liberty, and a placement review hearing must be held within six months. 94 N.J. at 141. All this is designed to protect the individual's constitutional right to liberty, which the State may no longer constitutionally restrict, without casting adrift an individual incapable of surviving on his own. 94 N.J. at 139, 140.
As the Supreme Court of Connecticut has observed, freedom from involuntary confinement is the natural state of individuals who have committed no crime. Fasulo v. Arafeh, *47 173 Conn. 473, 378 A.2d 553, 557 (1977), cited with approval in State v. Fields, 77 N.J. at 300. NGIs, not having possessed the requisite mental state to commit a crime, cannot be considered criminals. State v. Fields, 77 N.J. at 300, n. 7; State v. Krol, 68 N.J. at 246. Therefore, the burden is placed on the State to justify infringement on a constitutional right. State v. Fields, supra; State v. Krol, supra.
Once a mentally ill individual is determined dangerous to self or others, a court is empowered to fashion restrictions on him which reduce that risk to an acceptable level, State v. Krol, 68 N.J. at 261, not to eliminate that risk altogether. Both Krol and Fields provide for the loosening of restrictions upon demonstrable improvement. State v. Fields, 77 N.J. at 303-304; State v. Krol, 68 N.J. at 257-258, 261-262. "The new order should provide for the least restrictive restraints which are found by the judge to be consistent with the well-being of the community and the individual." State v. Fields, 77 N.J. at 302-303.
We conclude that there is a constitutional right to the least restrictive environment appropriate to the protection of society and the rights of the individual.
J.L.J. contends that the "preponderance of the evidence" standard, mandated by N.J.S.A. 2C:4-8b(3) for committing individuals found not guilty by reason of insanity, violates his right to due process and equal protection. We disagree.
State v. Krol established that, after acquittal by reason of insanity, an individual may be committed if the State proves by a preponderance of the evidence that the individual is mentally ill and dangerous to himself or others. 68 N.J. at 253, 257. Further, the State must bear the burden of proof at the periodic reviews to justify continuing restrictions on the NGI's liberty by establishing, by a preponderance of the evidence, that such restrictions currently meet the Krol criteria. State v. Fields, 77 N.J. at 293.
*48 In 1979, the United States Supreme Court decided Addington v. Texas, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979). Addington held that the Fourteenth Amendment Due Process Clause required the "clear and convincing" standard of proof in state involuntary commitment proceedings. In balancing the State's interest in the protection of society and the individual's liberty interest, the Court observed:
At one time or another every person exhibits some abnormal behavior which might be perceived by some as symptomatic of a mental or emotional disorder, but which is in fact within a range of conduct that is generally acceptable. Obviously, such behavior is no basis for compelled treatment and surely none for confinement. However, there is the possible risk that a factfinder might decide to commit an individual based solely on a few isolated instances of unusual conduct. Loss of liberty calls for a showing that the individual suffers from something more serious than is demonstrated by idiosyncratic behavior. Increasing the burden of proof is one way to impress the factfinder with the importance of the decision and thereby perhaps to reduce the chances that inappropriate commitments will be ordered. [441 U.S. at 427, 99 S.Ct. at 1810]
That same year this court held that the United States Supreme Court intended the higher standard to apply as well in the periodic review hearings for NGI committees. In re Scelfo, 170 N.J. Super. 394, 397 (App.Div. 1979).
Nonetheless, in 1981 the Legislature amended N.J.S.A. 2C:4-8b(3) to provide expressly for a preponderance of the evidence standard:
The defendant's continued commitment, under the law governing civil commitment, shall be established by a preponderance of the evidence, during the maximum period of imprisonment that could have been imposed, as an ordinary term of imprisonment, for any charge on which the defendant has been acquitted by reason of insanity. [L. 1981, c. 290, § 9]
In June 1983, the United States Supreme Court decided Jones v. United States, 463 U.S. 354, 103 S.Ct. 3043, 77 L.Ed.2d 694 (1983). In Jones, the Court held that an NGI, committed on a showing by a preponderance of the evidence of mental illness and dangerousness, did not have his due process rights violated. 463 U.S. at ___, 103 S.Ct. at 3051, 77 L.Ed.2d at 707. The Court distinguished NGIs, as a class, from civil committees, who are less likely to be dangerous than those found already to *49 have committed a crime. 463 U.S. at ___, 103 S.Ct. at 3049, 3051, 77 L.Ed.2d at 705, 707.
In light of Jones, we declared the preponderance of the evidence standard to be constitutional in In re A.L.U., 192 N.J. Super. 480, 485 (App.Div. 1984). The holding in Scelfo was declared to have been incorrectly decided. Id.
At present, our courts and Legislature require only a preponderance standard for NGI commitments. N.J.S.A. 2C:4-8b(3); State v. Fields, supra; State v. Krol, supra; In re A.L.U., supra. The United States Supreme Court finds this constitutionally acceptable. So do we.
J.L.J., J.D.M. and W.J. all claim that their continued commitment at the same level of restraint was erroneous and against the weight of the evidence.
The scope of appellate review of judgments of commitment and continuing restraints for Krol patients is extremely narrow. State v. Fields, 77 N.J. at 311. An appellate court should give the utmost deference to the reviewing judge's determination of the appropriate balancing of societal interests and individual liberty. 77 N.J. at 311. That determination will be subject to modification only where the record reveals a clear mistake in the reviewing judge's broad discretion in evaluating the patient's current condition and formulating a suitable order. 77 N.J. at 311.
Of course, the appellate court is not required to give deference to a lower court which misconstrued or misapplied the law. State v. Steele, 92 N.J. Super. 498, 507 (App.Div. 1966).
J.L.J.
J.L.J. is unmotivated and has a history of hospitalizations for mental illness. The last time, he was supervised on an out-patient basis with no one to monitor him. When he felt well enough, he stopped checking in to receive his medication. After this occurred, he regressed and committed the arson for which he was involuntarily committed.
*50 Both experts seem to agree that he does not present a danger or an escape risk at present, and that he should be transferred to a less restrictive setting. Dr. Blechman, the I.T.U. staff psychiatrist, was more guarded in his diagnosis and predictions about J.L.J.'s future conduct, because of the paucity of information J.L.J. volunteers during interviews. When told to attend classes and counseling sessions, J.L.J. goes, but he does not participate, nor does he take advantage of the alcohol and drug abuse programs currently available to him.
Both Drs. Blechman and Kuvin, the independently retained psychiatrist, indicated that J.L.J. was not the type to respond to the modality of treatment (i.e., intensive) afforded at the I.T.U. The problem with moving him to a less restrictive, less intense setting is found in State v. Fields: "If the State is satisfied that continuance of the current restraints would be adequate, it must demonstrate only that there has been no material change ... which would warrant a relaxation of the prevailing level of restraints on his liberty." 77 N.J. at 302. The State has amply demonstrated that no material change in J.L.J. exists.
We conclude that the record supports the Law Division judge's determination not to release this committee.
J.D.M.
In J.D.M.'s case there is no question of abuse of discretion. There are enough recent instances of rule infractions to justify the judge's refusal to discharge him from Krol status. The judge did, however, give J.D.M. permission to find off-grounds employment, which was a privilege he had not had before the review hearing. This action is in line with the direction in State v. Fields that the Krol patients' lessening of restraints and return to society should come in gradual stages of deescalation. State v. Fields, 77 N.J. at 303.
The judge was concerned that he could not supervise J.D.M. on the outside, because to allow him outside necessitated a discharge from Krol.
*51 He can, however, order a conditional discharge and place restrictions on J.D.M., even outside of Greystone, without necessarily moving him to a county transitional facility as such. See N.J.S.A. 2C:4-8b(2); State v. Fields, 77 N.J. at 303; State v. Krol, 68 N.J. at 257. Under Fields and Krol, the reviewing judge is given a broad discretion to creatively mold the order and conditions of restraint according to the patient and the situation.
W.J.
W.J. had made two escape attempts before his transfer to the maximum security of the Vroom Building. He has, however, shown no desire to escape or to engage in violent behavior since his transfer over a year ago, and his condition has improved continuously. His regression in June 1983 was due to the doctors' discontinuance of medication. When the medication was reinstated, W.J. improved again.
The judge stated that if W.J. were taken out of the "standard setting" of the Vroom Building, he would not take his medication and would attempt to escape. W.J. seems to realize, however, that he is less confused and feels better when taking medication.
The judge also stated that Dr. Short could not say whether the patient would improve outside the Vroom Building in a less restrictive setting. In the exchange to which the judge referred, the doctor was asked whether W.J. would improve if he continued in the Vroom Building. She stated that he might improve or regress, depending on how he reacted to not being rewarded with a less restrictive setting after behaving well.
Fields and Krol both emphasize that the reviewing judge must determine, giving appropriate weight to past conduct, the most appropriate restrictions justified by the patient's current condition.
W.J. claims that the decision below was contrary to the weight of the evidence. But the evidence did show that the *52 committee had unsuccessfully been placed in the less restricted environment and had assaulted persons there and attempted to escape; that he would be dangerous if he had access to drugs, with which he had experience, and that drugs were more readily available in the less restrictive environment. We cannot say that the judge below reached a conclusion which is not supported by substantial evidence in the record, especially since the patient will be subject to a further review in October of this year.
All of the orders appealed are affirmed.
NOTES
[1] State v. Krol, 68 N.J. 236 (1975).
[2] Level 3 privileges entitle J.L.J. to stay on the ward or go with other patients, under supervision, to the gym in the same building for exercise; to go to occasionally held social activities, under supervision; and to go on the grounds with staff supervision. Level 4 is a grounds pass without the company of a staff member and entitles one to leave the grounds under the supervision of a staff member for such things as field trips.