281 N.J. Super. 102 (1995)
656 A.2d 861
IN THE MATTER OF D.C.[1]
Superior Court of New Jersey, Appellate Division.
Argued February 1, 1995.
Decided April 27, 1995.
*104 Before Judges SHEBELL, WALLACE and KLEINER.
Vincent W. Basile argued the cause for appellant, D.C. (Flood & Basile, attorneys; Mr. Basile, of counsel and on the brief and letter-brief).
Benjamin Clarke and Daisy B. Barreto argued the cause for respondent State of New Jersey (Deborah T. Poritz, Attorney *105 General, attorney; Mr. Clarke, Assistant Attorney General, of counsel; Mr. Clarke and Ms. Barreto, Deputy Attorney General, on the brief).
William Torre argued the cause for respondent Adjuster of Bergen County (Torre & Torre, attorneys; Mr. Torre, of counsel and on the letter-brief).
The opinion of the court was delivered by KLEINER, J.A.D.
The two appeals we are called upon to review pose significant issues of first impression under the civil commitment statute, N.J.S.A. 30:4-27.1 to -27.23, and particularly the authority of the Attorney General to initiate and participate in involuntary civil commitment proceedings. Subsumed in this analysis is a secondary question, whether D.C.'s right to due process was violated by the action of the Attorney General.
For reasons more fully amplified in Part II, on January 7, 1993, the office of the Attorney General filed a verified complaint seeking the issuance of an order to show cause to compel D.C. to submit to two psychiatric examinations by psychiatrists selected by the Attorney General. The court executed the order returnable January 14, 1993. D.C. filed an answer contesting the State's factual allegations and challenging the procedural basis for the State's application. After a hearing, the trial court ordered that D.C. submit to the requested examinations, which were thereafter conducted on January 17 and 18, 1993.
On January 21, 1993, the court conducted another hearing, reviewed the psychiatric reports, both dated January 18, 1993, and concluded that there was probable cause to believe that D.C. was mentally ill and a danger to others. The court, pursuant to R. 4:74-7(c) and N.J.S.A. 30:4-27.10e, entered an order temporarily committing D.C. to Bergen Pines County Hospital pending a plenary commitment hearing, which it scheduled for February 8, 1993.
*106 After four days of testimony (February 8, 11, 16 and 17, 1993), the court, on February 19, 1993, concluded that there was clear and convincing evidence that D.C. was in need of involuntary commitment[2] as D.C. suffered from mental illness, N.J.S.A. 30:4-27.2r,[3] and that there existed a substantial likelihood that he would *107 inflict serious injury in the reasonably foreseeable future. D.C. was committed to Bergen Pines County Hospital but shortly thereafter was transferred to the Forensic Psychiatric Hospital in Trenton, where he has remained as a civil committee.
A civil commitment review hearing was conducted before another judge commencing June 3, 1993 and continuing on four additional dates, including June 23, 1993. On July 1, 1993, the review judge continued D.C.'s commitment.
D.C. initially filed an appeal from the order of commitment entered February 22, 1993, and thereafter filed an amended notice of appeal to encompass an appeal from the order executed July 23, 1983, which directed that D.C. remain involuntarily committed.
While the appeal was pending, D.C.'s commitment was again reviewed on January 28, 1994, and his commitment was continued by order dated March 14, 1994. D.C. filed a separate appeal.[4] Both appeals were scheduled for disposition on the same calendar. We have elected to decide both appeals in one opinion.

I
D.C., now age forty, was born February 5, 1955. He was first arrested at age seventeen on theft charges and was thereafter adjudicated a juvenile delinquent. He was placed in the Oceanfields *108 Residential Treatment Center but ran away after two months.
Shortly thereafter, D.C., then an adult, was arrested and charged with breaking and entering and theft. Upon his conviction, he was sentenced as a youthful offender to the Youth Correctional Center at Yardville. He was paroled in June 1973, having served ten months.
On October 21, 1973, D.C. was charged with three counts of abduction, in violation of N.J.S.A. 2A:86-2, and three counts of impairing the morals of a child, in violation of N.J.S.A. 2A:96-3. On May 24, 1974, he was convicted and sentenced to the Youth Correctional Center for an indeterminate term not to exceed eight years.[5] He was paroled in 1976.
On December 8, 1978, D.C. was convicted for possession of a switchblade knife. Although he was again sentenced to The Youth Correctional Center at Yardville, his sentence was "suspended."[6]
On July 12, 1980, D.C. kidnapped and sexually molested a twenty-three year-old woman. Immediately after the criminal episode, he surrendered to the police. In September 1980, D.C. was convicted of aggravated sexual assault, contrary to N.J.S.A. 2C:14-2a(6), and kidnapping, contrary to N.J.S.A. 2C:13-1b(1).[7] *109 He was sentenced to two concurrent terms of imprisonment for a period of twenty years with a ten year period of parole ineligibility to be served at the Adult Diagnostic Treatment Center (Avenel). D.C. was unconditionally released on November 17, 1992, having served his maximum sentence.[8]

II
During 1992 at Avenel, D.C. was provided therapy by Kay E. Jackson, Ph.D., a staff clinical psychologist. In an affidavit attached to the verified complaint, Dr. Jackson stated:
10. During these meetings, [D.C.] was honest with his parents about his continuing sexual arousal to sadistic fantasies involving rape, torture and mutilation of adult women. His most prevalent fantasy remains that of abducting a victim, taking her to a wooded area, tying her to trees, sexually assaulting her, torturing, and sometimes, ultimately killing her. In short, he continues to be strongly aroused to the fantasy of committing sexual offenses.
12. At the beginning of November 1992, I contacted Dr. Beril to verify his opinion of [D.C.] vis-a-vis confinement. Dr. Beril offered the opinion that though the likelihood that [D.C.] would recommit was great, he was not at this point in time eligible for involuntary confinement because he was not "openly psychotic." This opinion was shared by the other two psychiatrists, Drs. Morgenstern and Fernandez.
[(emphasis added.)][9]
*110 Jackson contacted the West Milford Police on November 16, 1992, and the Bergen County Prosecutor's Office on November 17, 1992. As a result of those phone calls, the prosecutor's office, in conjunction with the Wyckoff police department, began round-the-clock surveillance of D.C., from his release from Avenel on November 17, 1992, to his temporary commitment on January 21, 1993, without interruption. D.C. was aware of this surveillance. He was living at the home of his parents. On December 8, 1992, he began weekly outpatient counseling at Avenel's extension program in Paterson.
The verified complaint refers to several incidents of unusual behavior.
16. On November 20, 1992, [D.C.] was seen leaving his parents' home out of the back door and entering a shed located at the rear of the property. While wearing surgical gloves, [D.C.] removed a duffel bag containing the same type of bondage equipment he used on the victim in 1980. These actions were captured on a video tape by the surveillance team.
....
....
19. On November 30, 1992, [D.C.] told an investigator from the Bergen County Prosecutor's Office that he would like to see the victim of his 1980 crime to "see how she was doing." He also told the investigator that he often thought about his ex-girlfriend and would like to see her again. In addition, he told a member of the surveillance team that he could not guarantee that he would not commit acts similar to the crime for which [sic] was previously incarcerated.

*111 20. On December 1, 1992, [D.C.] told a member of the surveillance team that he still loves his ex-girlfriend and was trying to locate her. He admits to obsessing about sadistic fantasies and his desire to repeat his acts.
21. Since his release, [D.C.] had been frequenting a local fast food establishment to look for young girls. At that establishment, [D.C.] was involved with two separate incidents with management. On one occasion, he blocked the door to the ladies room and on another he spoke to a couple that he did not know, telling them they had a beautiful young daughter of whom they should be proud. Since December 11, 1992, [D.C.] has been barred from the establishment.
22. On January 4, 1993, a surveillance team member was assigned to take a photograph of him as his appearance had recently changed (he had shaved his beard leaving only a moustache). As the surveillance team member was photographing [D.C.], he [D.C.] turned towards the camera and display [sic] the middle finger of his right hand extended upward. He told the surveillance team member that if he "took any more pictures, he would make things hard for" the surveillance team.
23. On January 4, 1993, at 8:00 p.m., [D.C.] ran to a ravine carrying a long length of rope coiled around his shoulder and a shorter piece of rope attached to what appeared to be a pulley system; he had a flashlight in his back pocket. The ground at the ravine was muddy and the area was unlit and dark. [D.C.] turned towards the surveillance team members following him and yelled "If you get any closer, I'll bury this grappling hook in your head! You should see what it will do to a human brain."
24. Also on January 4, 1993, at 8:00 p.m., [D.C.] walked to the waterfall at the ravine. The temperature was about 40 degrees. [D.C.] removed his overcoat and shirt. While bare-chested he began to tie ropes across the ravine. For about 15 to 20 minutes he threw rocks into the stream. He tied a rope around a rock about three feet in diameter, dragged the rock from one side of the stream to the other and left these ropes strung across the stream. [D.C.] was intermittently on all fours with his hand in the water up to his elbows. At about 10:00 p.m., he left the ravine, leaving behind the ropes.
25. On January 5, 1993, [D.C.] left his home carrying a long yellow nylon rope and walked to a wooded area down the block from his home. He spent four hours in the woods during which time he strung the yellow nylon rope across the stream, attaching it to a pulley already in place on the far side of the stream. Later he punched a stone pillar with his hand and extended the middle finger of his right hand into the air. He told the surveillance team members that he would "smash any f---in' camera I can get my hand son [sic]" and that he was "through being a nice guy." While walking back to his residence he ran up to a car with three teenage occupants, began to pound on the driver's side window, and screamed "If you want f---ing trouble, I'll give you f---ing trouble."
During the surveillance, a person on the prosecutor's staff requested D.C.'s examination for possible involuntary civil commitment by an emergency psychiatric screening unit associated with the Mid-Bergen Mental Health Center, pursuant to N.J.S.A. 30:4-27.5. *112 D.C. voluntarily agreed to that examination conducted by Dr. Joel Fetterbush, a staff psychiatrist, on December 11, 1992. Dr. Fetterbush concluded that D.C. was not in need of involuntary civil commitment.
As noted in Part I, D.C., pursuant to court order, was examined by two private psychiatrists selected by the Attorney General. Dr. Taylor Chamberlain concluded that D.C. was mentally ill and dangerous to others, as he suffered from schizoidal personality disorder and antisocial personality disorder. Dr. Stanley Kern concluded that D.C. suffered from a personality disorder and "manifested paranoid ideation regarding authority figures." Kern did not believe D.C. was imminently dangerous to others but opined that D.C. was an extremely angry individual and potentially dangerous to others. Kern's report did not explicitly state that D.C. was mentally ill and in need of involuntary commitment.
Over the objection of D.C., the trial court concluded that the written reports of Chamberlain and Kern were equivalent to "clinical certificates" for purposes of R. 4:74-7(b)(2) and N.J.S.A. 30:4-27.10b, and that the Attorney General had the authority to initiate commitment proceedings by the use of its parens patriae authority. Adopting the recommendations of Chamberlain and Kern, the court entered the temporary commitment order pursuant to R. 4:74-7(c) and N.J.S.A. 30:4-27.10e.
At the plenary hearing which commenced February 8, 1993, the Attorney General sought permission to present direct testimony. D.C. objected, contending that the direct case was to be presented by Bergen County's counsel, N.J.S.A. 30:4-27.12, or by the Bergen County Adjuster, ibid. Initially the court agreed, but it permitted the Assistant Attorney General to supply questions to Bergen County counsel while conducting the examination of his expert psychiatrist witness, Dr. Peter Martindale, a staff psychiatrist at Bergen Pines and D.C.'s attending physician of record.
Martindale examined D.C. on five occasions during the eighteen days preceding the plenary hearing. He concluded that D.C. suffered from a character disorder, i.e., an "antisocial personality *113 disorder" with a diagnosis of sexual sadism, but that D.C. was not mentally ill and did not require involuntary commitment. He opined that D.C. was a "potential danger" but could not opine whether D.C. posed a danger to anyone in the reasonably foreseeable future.
On cross-examination, Martindale admitted that criminals, as a class, suffer from antisocial personality disorder more than the general population. He acknowledged that if psychiatrists were to commit involuntarily based on antisocial personality disorders, a tremendous number of those released from penal institutions would be committed. Martindale also agreed that if doctors committed on the basis of character disorders alone, they would be engaged in what amounts to "preventative detention."
After Martindale testified, the Attorney General made an application to permit the testimony of Drs. Chamberlain and Kern and Jackson, the Avenel psychologist. That application was granted over D.C.'s objection. Despite the court's earlier ruling, the Attorney General presented the testimony of these witnesses contrary to N.J.S.A. 30:4-27.12.
Chamberlain's testimony was consistent with his written report of January 18, 1993. Kern's testimony indicated that D.C. manifested "sexual sadism and underlying personality disorder," and that sexual sadism met the standard for mental illness under the commitment statute. He opined that D.C. was likely to inflict serious bodily injury or harm upon another within the reasonably foreseeable future.
On cross-examination, Kern admitted that a person is generally not found to be committable on the basis of antisocial personality disorder alone. He acknowledged that the Attorney General directed him to review the statutory definition of mental illness to determine if D.C. fit the statutory definition. He admitted that the Attorney General's request was unusual for commitment hearings.
*114 D.C. then recalled Martindale for additional cross-examination. Martindale indicated that D.C. could have been discharged on Martindale's own authority, N.J.S.A. 30:4-27.17[10] but "in this case the law is being scrutinized like in no other commitment case that I've had anything to do with" and that his release of D.C. would have been extremely awkward, if not impossible. Martindale also indicated that the interpretation of "mental illness" utilized by both Chamberlain and Kern was not the standard normally applied in commitment proceedings by the medical and psychiatric community.
The last witness was Dr. Daniel Paul Greenfield, who testified on behalf of D.C. based upon two separate examinations: the first prior to January 18, 1993, and the second on February 15, 1993. Greenfield concurred that D.C. suffered from sexual sadism which was in remission and an antisocial personality disorder. He opined that as D.C. was not engaging in antisocial behavior and was not actively psychotic or symptomatic, there was no basis for *115 involuntary civil commitment. He also opined that D.C.'s antisocial personality was not curable and although D.C. was potentially dangerous, he was not dangerous to others within the "reasonably foreseeable future."
As noted, the court concluded that there was clear and convincing evidence that D.C. was in need of involuntary commitment, and an order of commitment was entered.
In the consolidated appeals, D.C. raises four points of error:
POINT ONE
THE ATTORNEY GENERAL'S PARTICIPATION IN THE CIVIL COMMITMENT OF [D.C.] WAS CONTRARY TO N.J.S.A. 30:4-27.1 ET SEQ. AND CONSTITUTES PLAIN ERROR.
A. JUDGE CIOLINO ERRED IN ENTERING AN ORDER COMPELLING [D.C.] TO SUBMIT TO PSYCHIATRIC EXAMINATIONS CONDUCTED BY TWO PSYCHIATRISTS RETAINED BY THE ATTORNEY GENERAL PRIOR TO THE INITIATION OF COMMITMENT PROCEEDINGS.
B. THE LOWER COURTS ERRED IN ALLOWING THE ATTORNEY GENERAL TO INTERVENE IN THE COMMITMENT OF [D.C.] CONTRARY TO N.J.S.A. 30:4-27.12.
C. THE LOWER COURTS ERRED IN ALLOWING THE TESTIMONY OF DRS. CHAMBERLAIN AND KERN AT THE COMMITMENT HEARING.
POINT TWO
JUDGE CIOLINO ERRED IN ORDERING THE TEMPORARY COMMITMENT OF [D.C.] BECAUSE THE COURT DID NOT RECEIVE TWO CLINICAL CERTIFICATES AND THERE WAS NO PROBABLE CAUSE TO BELIEVE THAT APPELLANT WAS MENTALLY ILL.
A. JUDGE CIOLINO ERRED IN ENTERING A FINAL COMMITMENT ORDER IN THE ABSENCE OF CLEAR AND CONVINCING EVIDENCE THAT [D.C.] IS MENTALLY ILL.
POINT THREE
JUDGE FOX ERRED IN CONTINUING THE COMMITMENT OF [D.C.] WHEN THE TREATMENT TEAM RECOMMENDED DISCHARGE AND IN THE ABSENCE OF CLEAR AND CONVINCING EVIDENCE THAT APPELLANT IS MENTALLY ILL.
POINT FOUR
THE ACTIONS OF THE ATTORNEY GENERAL AND THE CONDUCT OF THE COMMITMENT PROCEEDINGS INSTITUTED AGAINST [D.C.] VIOLATED HIS RIGHTS TO DUE PROCESS OF LAW.
As we conclude that error in the commitment process requires reversal of D.C.'s involuntary commitment, we need not address *116 the third point of error, which focuses upon the commitment review hearing proceedings.

III
In N.J.S.A. 30:4-27.1b, the Legislature made it clear that involuntary commitment proceedings must strictly adhere to statutory safeguards:
Because involuntary commitment entails certain deprivations of liberty, it is necessary that State law balance the basic value of liberty with the need for safety and treatment, a balance that is difficult to effect because of the limited ability to predict behavior; and, therefore, it is necessary that State law provide clear standards and procedural safeguards that ensure that only those persons who are dangerous to themselves, to others or to property, are involuntarily committed.
[Ibid.]
The Supreme Court has also recognized the important of safeguards:
The authority of the State to civilly commit citizens is said to be an exercise of its police power to protect the citizenry and its parens patriae authority to act on behalf of those unable to act in their own best interests. Addington v. Texas, 441 U.S. 418, 426, 99 S.Ct. 1804, 1809, 60 L.Ed.2d 323, 331 (1979); O'Connor v. Donaldson, 422 U.S. 563, 582-83, 95 S.Ct. 2486, 2497, 45 L.Ed.2d 396, 411-12 (1975) (Burger, C.J., concurring). However, because commitment effects a great restraint on individual liberty, this power of the State is constitutionally bounded.
[In re S.L., 94 N.J. 128, 136-37, 462 A.2d 1252 (1983) (citations omitted).]
The safeguards promulgated to ensure that due process is afforded to a prospective civil committee must be scrupulously followed; short cuts in the commitment process are not permitted. Matter of Commitment of Raymond S., 263 N.J. Super. 428, 432, 623 A.2d 249 (App.Div. 1993); See also Fair Oaks Hosp. v. Pocrass, 266 N.J. Super. 140, 149, 628 A.2d 829 (Law Div. 1993) (requiring meticulous adherence to statutory and constitutional criteria in involuntary commitment proceedings).
The civil commitment statute only provides two very specific procedures for commencing an involuntary commitment. These are also embodied in N.J.S.A. 30:4-27.10a (proceeding instituted by a short-term care or psychiatric facility or a special psychiatric hospital) and N.J.S.A. 30:4-27.10b (proceeding instituted by the submission to the court of two clinical certificates, at least one of *117 which is prepared by a psychiatrist). These methods are also embodied in R. 4:74-7. Either type of commitment must consider "the least restrictive conditions necessary to achieve the purposes of treatment." N.J.S.A. 30:4-27.11d(b)(2). See Matter of Commitment of J.L.J., 196 N.J. Super. 34, 47, 481 A.2d 563 (App.Div. 1984), certif. denied, 101 N.J. 210, 501 A.2d 893 (1985) (recognizing a constitutional right to the least restrictive environment appropriate to the protection of society and the rights of the individual).
The crux of the civil commitment statute is the creation of a system of county-based public mental health screening facilities, defined in N.J.S.A. 30:4-27.2z, charged with the responsibility of providing assessment, emergency and referral services to mentally ill patients.
The legislative intent to make screening facilities the gateway to the public mental health system is further evidenced by N.J.S.A. 30:4-27.4, which states that "screening service evaluation is the preferred process for entry into short-term care facilities or psychiatric facilities so that appropriate consideration is given to less restrictive treatment alternatives." Ibid. It is likewise evidenced by N.J.S.A. 30:4-27.5a, which provides that "[a] screening service shall serve as the facility in the public mental health care treatment system wherein a person believed to be in need of commitment to a short-term care, psychiatric facility or special psychiatric hospital undergoes an assessment to determine what mental health services are appropriate for the person and where those services may be most appropriately provided." Ibid. (emphasis added).
If a mental health outreach screener certifies that there is probable cause to believe a person is in need of involuntary commitment, that person is transported to a full screening service for a complete assessment. If a subsequent examining psychiatrist at the full screening facility also believes the person is in need of involuntary commitment, he or she completes the screening certificate and admits the person to an appropriate psychiatric *118 facility for observation and further evaluation, for a period not to exceed seventy-two hours. N.J.S.A. 30:4-27.9c.
The facility may initiate court proceedings if involuntary commitment is warranted by submitting two clinical certificates to the court: (1) the screening certificate which authorized admission of the patient to the facility; and (2) a certificate completed by a psychiatrist at the facility who is on the patient's treatment team. N.J.S.A. 30:4-27.10a. Commitment is warranted only if "the person is mentally ill and that mental illness causes the person to be dangerous to self or dangerous to others or property, and appropriate facilities or services are not otherwise available." N.J.S.A. 30:4-27.9b. Even law enforcement authorities authorized to participate in the involuntary commitment process must utilize a mental health screener to determine if an individual will require a complete mental health assessment. N.J.S.A. 30:4-27.6.
The only alternative procedure authorized is set forth in N.J.S.A. 30:4-27.10b and R. 4:74-7(b)(2).[11] The statute specifically provides:
Court proceedings for the involuntary commitment of any person not referred by a screening service may be initiated by the submission to the court of two clinical certificates, at least one of which is prepared by a psychiatrist. The person shall not be involuntarily committed before the court issues a temporary court order.
[N.J.S.A. 39:4-27.10b.]
Both statutorily approved methods require a court to review the two certificates to determine whether there is probable cause to believe that the person is in need of involuntary commitment. N.J.S.A. 30:4-27.10d. Only then is a temporary order of commitment authorized. N.J.S.A. 30:4-27.10e.
We conclude that any deviation from these strict procedures cannot be countenanced. Involuntary civil commitment procedures are designed to protect fundamental liberty interests *119 and to ensure due process of law. N.J.S.A. 30:4-27.1c. The focus is placement in the least restrictive environment necessary to achieve the statute's goals: treatment of the mentally ill and protection of the public. Under the statutory scheme the courts, by virtue of their parens patriae jurisdiction, have "a right and duty to protect the public interest and to protect such persons with disabilities who have no rightful protector." State in the Interest of R.G.W., 145 N.J. Super. 167, 182, 366 A.2d 1375 (J. & D.R.Ct. 1976) (citing Johnson v. State, 18 N.J. 422, 430, 114 A.2d 1 (1955), cert. denied, 350 U.S. 942, 76 S.Ct. 318, 100 L.Ed. 822 (1956)). The State is likewise vested with parens patriae power, and its authority to civilly commit citizens is said to be grounded in both "its police power to protect the citizenry and its parens patriae authority to act on behalf of those unable to act in their own best interests." In re S.L., supra, 94 N.J. at 136, 462 A.2d 1252 (citing Addington v. Texas, 441 U.S. 418, 426, 99 S.Ct. 1804, 1809, 60 L.Ed.2d 323, 331 (1979); O'Connor v. Donaldson, 422 U.S. 563, 582-83, 95 S.Ct. 2486, 2497, 45 L.Ed.2d 396, 411-12 (1975) (Burger, C.J., concurring)).
Although the Attorney General is vested with the right and duty to protect the public interest, in the exercise of that right and duty, the Attorney General must still adhere to the clear mandate of the legislature. Alexander v. New Jersey Power & Light Co., 21 N.J. 373, 380, 122 A.2d 339 (1956); Wilentz v. Hendrickson, 133 N.J. Eq. 447, 454-55, 33 A.2d 366 (Ch.Div. 1943), aff'd, 135 N.J. Eq. 244, 38 A.2d 199 (E. & A. 1944); But see, L. 1994, c. 134, approved October 31, 1994 ("The bill would codify what is inherent in the Attorney General's common law responsibility to act on behalf of the State, as parens patriae  a grant of authority to seek civil commitment when the public safety requires.")
If the Attorney General believed that D.C. was mentally ill and dangerous to the public, her parens patriae authority to protect the public should have been exercised by following the prescribed statutory procedure, i.e., directing law enforcement officers to take D.C. into custody if their observations so warranted and transporting *120 him immediately and directly to the Bergen County mental health screening facility for evaluation by a mental health screener. See Fair Oaks Hosp., supra, 266 N.J. Super. at 147, 628 A.2d 829 (recognizing that there is no authority in the statute for a state officer to take a person to any facility other than a public screening service).
The Attorney General, however, was not permitted on the facts of this case to utilize the alternative involuntary commitment method authorized by N.J.S.A. 30:4-27.10b, nor did the court have authority to issue an order requiring D.C. to submit to two psychiatric evaluations by private psychiatrists selected by the Attorney General. The court's authority is only triggered by receipt of clinical certificates prepared pursuant to statutory criteria. The Attorney General had the clear opportunity to adhere to the statute, here N.J.S.A. 30:4-27.10a in conjunction with N.J.S.A. 30:4-27.6a, to seek D.C.'s involuntary commitment. The Attorney General failed to follow the correct procedure and cannot utilize N.J.S.A. 30:4-27.10b to accomplish its objective, particularly so, where strict compliance with N.J.S.A. 30:4-27.10b was not followed.
R. 4:74-7(d) provides that the court may "order testing or examination of the patient by an independent psychiatrist, psychologist or other expert." Ibid. However, this provision deals with the issue of discovery once an action for civil commitment has already been initiated by either of the two methods permitted by statute, both of which require submission of two clinical certificates. It does not authorize the court to order testing prior to the time it acquires jurisdiction over the matter by virtue of a properly initiated action.
We reject the argument of the Attorney General that it was necessary to proceed outside the statutory guidelines due to the exceptional circumstances of this case, cited as the failure of the psychiatrists at Avenel and the Bergen County mental health screener, Fetterbush, to utilize the correct definition of mental illness. The Attorney General contends that the only way to *121 ensure that the commitment laws were properly administered in the case of D.C. was to obtain evaluations by psychiatrists who were capable of applying a "correct" definition.[12]
We disagree. If the Avenel psychiatrists and the mental health screener employed by the Division of Human Services were using improper commitment criteria, the Attorney General and the Division needed to resolve the matter on a universal rather than case-specific level. The commitment statute provides no right to appeal a determination that an individual is not mentally ill. The Attorney General's disagreement with the screening psychiatrists' conclusions did not authorize that office to bypass established and mandated commitment procedures to obtain a "second opinion" or allow the court to review the conclusions reached by the screening psychiatrist.
Additionally, we note that Fetterbush was not called as a witness at the temporary commitment hearing. The court neither questioned nor concluded that the mental health screener had utilized an improper interpretation of mental illness when he concluded on December 11, 1992, that D.C. was not in need of involuntary commitment. The same is also true of the opinions of Avenel staff psychiatrists Drs. Beril, Morgenstern and Fernandez.
In this case, D.C. was examined by at least one Avenel psychiatrist, Beril, and perhaps by two others, Morgenstern and Fernandez, before his release. He was also examined by the Mid-Bergen Community Health Center after his release. Those examinations resulted in findings that D.C. was not mentally ill and dangerous to others. D.C. was not a candidate for involuntary commitment on January 9, 1992, when the court issued the order to show cause.
The legislature expressly prohibited exceptions or deviations from the civil commitment procedures set forth in the statute, *122 stating that "[t]he standards and procedures in this act apply to all adults involuntarily committed to a short-term care facility, psychiatric facility or special psychiatric hospital...." N.J.S.A. 30:4-27.3 (emphasis added). No exception should have been permitted here.
The judgment of involuntary commitment is reversed.
SHEBELL, P.J.A.D., dissenting.
In my view, the appeal filed by D.C. from the initial commitment order is moot as it is clear that D.C. satisfies the definition of mental illness as set forth in N.J.S.A. 30:4-27.2r, as amended, effective October 31, 1994. There have been no appeals from the more recent orders continuing his commitment after periodic review hearings during this past year.
In any event, I must express my strong dissent from the majority's assertion that "[t]he court's authority is only triggered by receipt of clinical certificates prepared pursuant to statutory criteria," that "any deviation from these strict procedures cannot be countenanced," and that the Attorney General and the Courts were powerless to by-pass the faulty opinion of the institutional psychiatrists by obtaining independent psychiatric evaluations. There is no evidence as claimed by the majority that the Legislature "expressly prohibited exceptions or deviations from the civil commitment procedures set forth in the statute," or even that the Legislature ever intended such a consequence. See N.J.S.A. 30:4-27.3.
There were indeed exceptional circumstances warranting the steps taken by the Attorney General and the court. They are to be applauded, not chastised. The record resoundingly vindicates their actions. Although there was a departure from the procedures set forth in the civil commitment statute, D.C. was afforded his full due process rights. In accordance with the State's parens *123 patriae authority, the Attorney General and the court recognized their duty to protect the public interest and have done so while scrupulously protecting D.C.'s due process rights. In re S.L., 94 N.J. 128, 137, 462 A.2d 1252 (1983); State in the Interest of R.G.W., 145 N.J. Super. 167, 182, 366 A.2d 1375 (J. & D.R.Ct. 1976).
D.C. was afforded due process by a less intrusive means than provided for under the statutory procedure. The Attorney General could have directed that D.C. be taken into custody as the documented observations of D.C.'s conduct, when considered along with his past history, warranted such action. N.J.S.A. 30:4-27.6. However, the Attorney General acted with an abundance of caution for D.C.'s rights, and afforded D.C. notice and a hearing before he was taken into custody. Thereafter, he was afforded two more hearings in which to argue his case. The Attorney General's failure to follow the method provided under the statute, N.J.S.A. 30:4-27.4, was not fatal. There was and continues to be clear and convincing evidence that D.C. was mentally ill and dangerous. Therefore, his involuntary commitment should stand.
Further, in the opinion of the experts, D.C. is just as dangerous today as he ever was and he will not submit to appropriate treatment. It is imperative that he remains confined or he will act-out his sadistic sexual fantasies and kill as predicted.
I would affirm.
NOTES
[1] Because this case involves an involuntary civil commitment, the committee, D.C., is identified only by his initials.
[2] N.J.S.A. 30:4-27.2m provides:

"In need of involuntary commitment" means that an adult who is mentally ill, whose mental illness causes the person to be dangerous to self or dangerous to others or property and who is unwilling to be admitted to a facility voluntarily for care, and who needs care at a short-term care, psychiatric facility or special psychiatric hospital because other services are not appropriate or available to meet the person's mental health care needs.
[Ibid.]
[3] N.J.S.A. 30:4-27.2r provides:

"Mental illness" means a current, substantial disturbance of thought, mood, perception or orientation which significantly impairs judgment, behavior or capacity to recognize reality, but does not include simple alcohol intoxication, transitory reaction to drug ingestion, organic brain syndrome or developmental disability unless it results in the severity of impairment described herein.
[Ibid.]
N.J.S.A. 30:4-27.2r was amended effective October 31, 1994, and "mental illness" is now defined as:
a current, substantial disturbance of thought, mood, perception or orientation which significantly impairs judgment, capacity to control behavior or capacity to recognize reality, but does not include simple alcohol intoxication, transitory reaction to drug ingestion, organic brain syndrome or developmental disability unless it results in the severity of impairment described herein. The term mental illness is not limited to "psychosis" or "active psychosis," but shall include all conditions that result in the severity of impairment described herein.
[Ibid. as amended by L. 1994, c. 134, § 5 (emphasis added).]
The amendment was part of an amendment to Title 30, regarding civil commitment procedures for mentally ill and dangerous sexual offenders, which itself was part of ten legislative enactments known as "Megan's Law." N.J.S.A. 2C:11-3, as amended by L. 1994, c. 132, § 1; N.J.S.A. 2C:25-29, as amended by L. 1994, c. 137, § 2; N.J.S.A. 2C:43-7, as amended by L. 1994, c. 127, § 1 and c. 130, § 3; N.J.S.A. 2C:44-3, as amended by L. 1994, c. 127, § 2 and c. 130, § 4; N.J.S.A. 2C:47-1, as amended by L. 1994, c. 130, § 5; N.J.S.A. 2C:47-3, as amended by L. 1994, c. 130, § 6 and c. 134, § 2; N.J.S.A. 2C:47-5, as amended by L. 1994, c. 134, § 3; N.J.S.A. 2C:52-2, as amended by L. 1994, c. 133, § 6; N.J.S.A. 30:4-27.2, as amended by L. 1994, c. 134, § 5; N.J.S.A. 30:4-27.10, as amended by L. 1994, c. 134, § 6; N.J.S.A. 30:4-27.12, as amended by L. 1994, c. 134, § 7; N.J.S.A. 30:4-27.13, as amended by L. 1994, c. 134, § 8; N.J.S.A. 30:4-27.15, as amended by L. 1994, c. 134, § 9; N.J.S.A. 30:4-27.17, as amended by L. 1994, c. 134, § 10; N.J.S.A. 45:14B-28, as amended by L. 1994, c. 134, § 11; N.J.S.A. 52:4B-44, as amended by L. 1994, c. 134, § 5; and L. 1994, c. 127 to 137 (amendments collectively referred to as "Megan's Law").
[4] N.J.S.A. 30:4-27.16a provides for periodic court review hearings for committed patients, "three months from the date of the first hearing, the next review hearing nine months from the date of the first hearing and subsequent review hearings 12 months from the date of the first hearing and annually thereafter." Ibid. Although D.C.'s involuntary commitment was again reviewed after March 14, 1994, no appeal has been filed from any order entered by the court, and a record of those proceedings has not been reviewed as part of these appeals.
[5] D.C. abducted three girls, one age nine, the other two, age ten. He tied two girls to a tree in the woods. He took the third girl for a walk to talk about sex. When she began to cry, he let her go. The other girls were able to untie themselves and to flee.
[6] The record on appeal fails to reflect the specific statutory charge leading to this conviction and fails to offer an explanation for the "suspended" sentence.
[7] The verified complaint in these civil commitment proceedings described this criminal episode as follows:

The official version of his offenses states that he abducted a 23 year old female in a wooded area. The offense, aside from the actual sexual components of rape and fellatio, included sadistic and hostile elements. [D.C.] used a vibrator and planned to use other "torture equipment" such as a scalpel, hypodermic needle, dildoes, rope and leather thongs. The use of these items was highly important and stimulating to [D.C.]. The attack ceased without the use of the latter portion of the equipment when [D.C.] observed blood coming from the victim's rectum, at which time he became upset. "Feeling sorry for her," as he describes it, plus anger over what he had done and his belief that the attack could have escalated to murder, all resulted in [D.C.] turning himself in to the authorities.
[8] while serving his sentence, D.C. was convicted for possession of a knife arising from an incident occurring prior to July 12, 1980. He was thereafter sentenced to a custodial term of four years concurrent with his sentence to Avenel. That sentence expired in 1984.
[9] As noted in n. 3, supra, the amendment to N.J.S.A. 30:4-27.2r effective October 31, 1994, eliminates a need to observe overt psychosis in diagnosing mental illness.

The American Psychiatric Association defines a psychotic (a person suffering from a psychosis) as one who:
[I]ncorrectly evaluates the accuracy of his or her perceptions and thoughts and makes incorrect inferences about external reality, even in the face of contrary evidence.... Direct evidence of psychotic behavior is the presence of either delusions or hallucinations (without insight into their pathological nature). The term psychotic is sometimes appropriate when a person's behavior is so grossly disorganized that a reasonable inference can be made that reality testing is markedly disturbed. Examples include markedly incoherent speech without apparent awareness by the person that the speech is not understandable and ... agitated, inattentive, and disoriented behavior. .. .
American Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders, DSM-III-R 404 (3d ed. rev. 1987); See also Black's Law Dictionary 1227 (6th ed. 1990) (defining psychosis as "a severe mental disorder in which the patient departs from the normal pattern of thinking, feeling, and acting. There is generally a loss of contact of reality. Progressive deterioration may occur.").
[10] N.J.S.A. 30:4-27.17 was amended October 31, 1994, as follows:

17. a. The treatment team at a short-term care or psychiatric facility or special psychiatric hospital shall, subject to the limitations set forth in subsection b. of this section, administratively discharge a patient from involuntary commitment status if the treatment team determines that the patient no longer needs involuntary commitment. If a discharge plan has not been developed pursuant to section 18 of this act, it shall be developed forthwith.
b. If the patient is confined pursuant to an order entered under section 15 of P.L. 1987, c. 116 (C.30:4-27.15) in a case in which the Attorney General or a county prosecutor participated, the treatment team shall, no less than 10 days prior to the proposed date of administrative discharge, provide written notice to the committing court and to the person or persons who presented the case for involuntary commitment. If, within five days of receipt of such notice, a person who presented the case for commitment files a request for a hearing on the issue of continuing need for commitment and serves notice of that request, in accordance with the provisions of section 13 of P.L. 1987, c. 116 (C.30:4-27.13), the treatment team shall delay the administrative discharge and the court shall schedule a hearing on the issue. The hearing shall be conducted in the manner provided in section 15 of P.L. 1987, c. 116 (C.30:4-27.15).
(cf: P.L. 1987, c. 116, s. 17)
[Ibid. as amended by L. 1994, c. 134, § 10.]
[11] This section of the statute could have been utilized by the Avenel Extension Program attended by D.C. as an outpatient if, for example, D.C.'s condition was observed to have deteriorated, warranting involuntary commitment consideration.
[12] The Attorney General argued that the correct definition of mental illness does not require a finding of psychosis. That view has now been adopted by amendment to N.J.S.A. 30:4-27.2r, L. 1994, c. 134, § 5.