693 A.2d 911

IN THE MATTER OF THE COMMITMENT
OF KENNETH A. CALU.

Superior Court of New Jersey
Appellate Division

Submitted April 22, 1997—Decided May 15, 1997.

Before Judges DREIER, D'ANNUNZIO and NEWMAN.

*Ivy Starr Minely,* attorney for appellant *Kenneth A. Calu* (*Ms. Minely,* on the brief).

*Maryann K. Bielamowicz*, Mercer County Prosecutor, attorney for respondent the State of New Jersey (*Charles Fisher*, Assistant Prosecutor, on the brief).

The opinion of the court was delivered by

NEWMAN, J.A.D.

The committee, Kenneth A. Calu (Calu), appeals from an order of January 16, 1996 denying less restrictive conditions in his privileges while a committee at Ancora State Psychiatric Hospital (Ancora). The three specific requests recommended by the treatment team were: (1) that Calu be permitted to walk unescorted to and from his on-grounds job; (2) that Calu be granted one half hour per week of open hours privilege to begin after three months of successful unescorted walks to and from work; and (3) that Calu be permitted to attend escorted substance abuse programs in the community. These requests were denied.

The relevant background leading up to the 1995–1996 *Krol* review hearing is as follows. On September 12, 1983, Calu killed his wife and two children with a shotgun. After a non-jury trial, the judge found Calu not guilty of these crimes by reason of insanity (NGI) and committed Calu to the Forensic Hospital in Trenton.

In November 1986, Calu was transferred to the Trenton Psychiatric Hospital. Calu was again transferred, in August 1989, to Ancora. Initially, the staff at Ancora placed Calu on Level One restrictions, the most restrictive of the classifications. On January 29, 1990, the court granted Calu partial Level Two privileges. In a March 16, 1992 order, Judge Thomas DeMartin permitted Calu "extended Level 2 privileges" which included on-ground treatment programs and activities, taking meals in a common cafeteria, and working on the grounds of the hospital. The judge required that all of these activities be undertaken in a supervisory setting of no lower than a 6:1 ratio of patients to staff. Other requests for Level Three type freedoms were denied in that order. The court denied Level Three privileges because Calu had admit-

ted to using marijuana and alcohol on hospital grounds during his confinement, had been gambling since his transfer to Ancora and violated other hospital regulations.

On June 7, 1993, Judge DeMartin continued the degree of confinement specified in the 1992 order. The court considered the fact that Calu had been placed on suicide prevention after gaining Level Two privileges. Calu was dropped to Level One privileges on September 30, 1992 after being found in the men's bathroom with his girlfriend. In light of these transgressions, other privileges recommended by the treatment team were not presented to the court at that June 1993 hearing. On August 5, 1994, the court continued the specifications of the 1992 order and denied Calu's request to walk to and from his job at Ancora unsupervised.

The 1995 *Krol* hearing began on October 18, 1995. Calu made a motion to have the hearing held *in camera.* Judge DeMartin denied the application.

The hearings took place on several dates through late 1995 and into January 1996. During these proceedings, the Mercer County Deputy First Assistant County Prosecutor entered an appearance on behalf of the State but later commented that she did not represent the State but, instead, appeared "on behalf of the people of Mercer County and the County itself." At the conclusion of the hearings, in an order entered January 16, 1996, Judge DeMartin denied the three specific requests previously mentioned.

Before this appeal was calendared, the 1996 *Krol* hearing began on October 23, 1996 and concluded November 6, 1996. The trial court issued its decision on December 17, 1996, again concluding Calu was mentally ill and that he likely posed a danger to himself or society. The trial court denied any increase in privileges requested by Calu.

Because there has been a subsequent review hearing with the entry of an order, Calu's arguments relating to the less restrictive conditions requested at the late 1995/January 1996 hearing are mooted. We have no reason to review the proceed-

ings because a new order has been entered based on a record that is not before us for review. Since Calu has already gone through the review process following his 1996 year of confinement, there is no remedy available for him even were we to find that there was anything wrong with Judge DeMartin's decision. We would not be ordering his release from the institution, but instead would remand for another hearing or place additional findings on the record. In essence, that has already been done. The mootness doctrine clearly applies. *See New Jersey Turnpike Auth. v. Parsons*, 3 *N.J.* 235, 240, 69 *A.*2d 875 (1949).

However, Calu raises other issues, which although presented at the hearing, are capable of repetition, yet evade review. *New Jersey Div. of Youth & Family Servs. v. J.B.*, 120 *N.J.* 112, 118–19, 576 *A.*2d 261 (1990) (finding that the issue of press presence at a DYFS hearing, although technically mooted "is one of considerable public importance and capable of repetition, yet evading review"). These issues relate to whether an *in camera* hearing should have been held because Calu was not seeking his release nor was there any potential that he would be released; that the reviewing court lacked the authority to evaluate the inpatient restrictions and privileges of Calu; and that the participation in the *Krol* periodic review hearing by the Mercer County Prosecutor was not authorized. We address these issues in the order mentioned because they are likely to surface at future *Krol* review proceedings.

## I.

Calu contends that the review hearing relating to a lower level of restrictions on his confinement should have been held *in camera*. In so arguing, he relies on *In re Edward S.*, 118 *N.J.* 118, 570 *A.*2d 917 (1990). Calu notes that since he was not requesting release, in fact would have opposed it if it was offered, *Edward S.* did not apply and his hearing should have been held *in camera*. Alternatively, Calu argues that even if *Edward S.* did apply to his case, he satisfied the requirements to obtain an *in*

*camera* hearing. We need not address his second argument because we are satisfied that the court should have held Calu's *Krol* hearing *in camera* because Calu was not seeking release.

The touchstone for determining whether an *in camera* hearing should have been held is our Supreme Court's decision in *Edward S.* There, the Court addressed the issue of whether NGI committees acquitted of murder fell under the absolute *in camera* requirements of *R.* 4:74–7. The Court recognized, generally, that NGI committees have a similar status to civil committees before the law. However, the Court also recognized three important limitations. First, consistent with the holdings in *State v. Krol,* 68 *N.J.* 236, 344 *A.*2d 289 (1975) and *State v. Fields,* 77 *N.J.* 282, 390 *A.*2d 574 (1978) NGI committees were to be accorded "substantial equality" with civil committees rather than absolute equality of treatment. *Edward S., supra,* 118 *N.J.* at 127–28, 570 *A.*2d 917. Second, "the substantial equality that is mandated is based on the reasons for the constitutional mandates, namely, the protection of the committees' liberty interest, not other interests such as privacy and confidentiality." *Id.* at 129, 570 *A.*2d 917. Third, the Court acknowledged the simple fact that there were differences between NGI committees and civil committees, justifying different treatment. *Ibid.* In light of these distinctions, the Court found there was no constitutional mandate to extend the absolute requirement for an *in camera* proceeding to NGI committees. *Id.* at 130, 570 *A.*2d 917 (interpreting *N.J.S.A.* 2C:4–8 and –9 in conjunction with *N.J.S.A.* 30:4–27.1 to –27.23). The Court held that "when the Legislature adopted the new law concerning civil commitments, it did not intend the absolute *in camera* requirement to apply to NGI commitments." *Id.* at 131, 570 *A.*2d 917.

> Here, given the policy considerations involved, we do not believe that the Legislature intended that an NGI committee, where the charge was murder, having obtained an acquittal through testimony in open court that he was insane and presumably most dangerous, at least at the time of the offense, could shortly thereafter be released and join society on the basis of closed proceedings that found that he was either sane or not dangerous.
>
> [*Id.* at 135, 570 *A.*2d 917.]

Therefore, the Court concluded that the absolute *in camera* requirement does not apply to NGI committees; that periodic hearings should be "held *in camera* unless good cause to the contrary is shown"; and that in the case of an NGI murder committee, good cause presumptively exists placing the burden on the committee to show that the hearing should be held *in camera*. *Id.* at 151, 570 *A.*2d 917.

The Court stated "when it comes to murder, the rule is that the periodic review hearings shall be *open* unless good cause to the contrary is shown." *Id.* at 138, 570 *A.*2d 917. In a footnote to that sentence, the Court wrote: "Our ruling applies only to hearings that might result in the release of the committee." *Id.* at 138 n. 11, 570 *A.*2d 917.

The Court went on to observe that "[t]he primary reasons for this rule is the need to preserve public confidence in the criminal justice system." *Id.* at 138, 570 *A.*2d 917. The Court noted that the general public has misgivings regarding criminal defendants who were not subject to criminal liability due to mental disorders, including: fears that truly guilty people may go free by using an insanity defense; a suspicion that an individual, judged to be insane, will reenter society after only a short period of treatment indicating that that individual either beat the system or is still insane; and general concerns of public safety. *Id.* at 138–39, 570 *A.*2d 917. Thus, preserving public confidence in the criminal justice system was of paramount importance. *Id.* at 139, 570 *A.*2d 917.

We are satisfied that the rationale expressed by our Supreme Court in *Edward S.* for establishing a presumption of open hearings did not apply to Calu's periodic review hearing. First, the language in *Edward S., supra,* expressly limits that Court's holding to a hearing where there is potential for release. That concern is not present here where the issue of release into the community is not a factor. Moreover, when we refer to release, we do not mean to imply that it be synonymous with and limited to discharge from the institution. Release includes the committee's unescorted access to the community outside the institution. The

committee would have the burden to show that the hearing should be held *in camera*. The nature and extent of the committee's potential freedom outside of the institution would be a factor for the court to consider in determining whether the committee has carried the burden for holding an *in camera* hearing.

While, arguably, allowing Calu to walk, unescorted, to and from his rehabilitative employment on the institution's grounds increases the potential for escape, that determination does not impact the public's confidence in the criminal justice system to the same extent that the committee's actual release does. A risk of escape is present whenever a person is involuntarily committed, no matter what safeguards are in place. The public interest, however, referenced in *Edward S.* does not raise concerns over the internal administration of a particular psychiatric ward, nor is the public entitled to question or affect the treatment of a mentally disabled individual. The public interest discussed in *Edward S.* is that an individual, who was at one time found to be not guilty of murder by reason of insanity, is given access to the community after proper treatment, recovery and process. It is a public interest spawned by the publicity surrounding the initial crime, the misconceptions surrounding the defense presented and the fear for future public safety. Internal, on-site treatment plans or programs do not impact these public concerns and should not give rise to the open hearing requirement. It is not until the NGI committee seeks unescorted, off-site privileges that this public interest is triggered.

When a hearing does not contemplate unescorted release, the existing safeguards built into the system by the Legislature would appear to adequately protect the public. The public interest in monitoring the continuing treatment of an individual is of much less concern.

We therefore see no reason to apply the holding in *Edward S.* to a review hearing where there is no possibility of release into the community because the hearing would not implicate the concerns addressed by our Supreme Court in *Edward S.* The reviewing court, whether acting in a closed or open proceeding, is still

required to review the recommendations with the same scrutiny. Interpreting *Edward S.* as we have, does not impact the public's confidence in the criminal justice system, but protects an emotionally and mentally challenged individual who is presumably in the recovery process from repeated public scrutiny.

## II.

Calu contends that the issue to be resolved at a *Krol* hearing is the continued need for hospitalization. Once that issue is resolved, a court may strongly recommend what manner of psychiatric inpatient care is appropriate, but may not interfere, so Calu asserts, with the treatment plan devised by the hospital unless the patient challenges the manner of treatment at an interim hearing. Calu argues that there is no support for the proposition that a court may institute inpatient restraints. According to him, these restraints are treatment decisions which fall under the discretion of those responsible for treatment of the committee. We disagree.

The reviewing court has the authority to place restraints on Calu even in his continued inpatient status. In *Krol, supra,* the Supreme Court found that after an NGI verdict, the State was required to prove, at a hearing, that the potential committee warranted restrictions on his or her liberty due to continuing mental illness and potential danger to self or society. 68 *N.J.* at 257, 344 *A.*2d 289. The hearing court was required to determine the restraints necessary to safeguard the public and provide the individual with treatment. *Id.* at 261, 344 *A.*2d 289. Additionally, the Court stated that orders imposing restrictive conditions could be modified provided that the party seeking to change them established that there was a change in the degree of dangerousness posed by the committee or terminated provided the party made a showing both that the committee was no longer mentally ill and dangerous. *Id.* at 263 n. 13, 344 *A.*2d 289.

The *Fields* Court found that an NGI committee possesses the same right to automatic periodic review as the civil committee, and that the State bears the burden of proving that continued restric-

tions on the committee's liberty are necessary. *Fields, supra,* 77 *N.J.* at 293, 390 *A.*2d 574. The *Fields* Court specifically pointed out that its holding did not diminish the committee's right to engage in an interim challenge of the imposed restraints "on the ground of a demonstrable improvement in their condition." *Id.* at 298, 390 *A.*2d 574.

At each periodic hearing, the State was required to "renew its authority to continue to subject a committee to a partial or total deprivation of his liberty at each periodic review hearing by demonstrating that such a deprivation is warranted by the committee's current condition." *Id.* at 301, 390 *A.*2d 574. If the State cannot meet this burden, the judge must fashion a new set of restrictions based on the committee's present condition. *Id.* at 302, 390 *A.*2d 574. The determination of the level of restraint "is a matter entrusted to the sound discretion of the reviewing judge based on his first-hand evaluation of the particular case and is one as to which he must be accorded a wide range of flexibility." *Id.* at 303, 390 *A.*2d 574. The Court continued:

At each periodic review proceeding the ultimate determination will set the level of restraints on the liberty of the committee which will prevail until the next review hearing, periodic or otherwise. The committee remains free to challenge the propriety of those restraints at any time in the interim between the scheduled periodic review hearings.... At any such committee-initiated review proceeding, the burden of proof is on the committee. As the moving party, the committee must demonstrate by a preponderance of the evidence that under the applicable criteria his request for the modification or termination of those restraints, as the case may be, should be granted.

[*Id.* at 303–04, 390 *A.*2d 574.]

Calu makes much of the factual distinctions between *Krol* and *Fields* and his case. Calu argues that *Krol* and *Fields* dealt with committees who were essentially outpatients or at the least had a higher degree of freedom than he did. Based on this distinction, Calu argues that Judge DeMartin's order in his case was not supported by *Krol* and *Fields,* and that the court was, in fact, interfering with Calu's constitutional right to treatment.

Not so. The language regarding the conduct of periodic hearings and committee challenges to restraints was not conditioned in any fashion. It is within the sound discretion of the

reviewing judge to determine the degree of restraints. Calu's argument that the reviewing judge's decision in this case interfered with his right to treatment because he is an inpatient is a distinction that does not impact the application of *Krol* and *Fields* to this case. An outpatient could make the very same argument that Calu makes here. For instance, were an outpatient to challenge a court imposed curfew, he or she could do so on the grounds of restraint of treatment as easily as Calu argues that the freedom to walk, unsupervised, 100 yards to and from his rehabilitative job at Ancora is part of his treatment.

While this additional "freedom" may reflect Calu's progress made in treatment and may even have been recommended by his treatment team, it is sufficiently related to liberty rights to warrant court intervention. This is not the case of a court ruling on what medication Calu must take or what rehabilitative activities, not affecting others, would benefit him. Here, the court made a decision that Calu has not made sufficient progress to warrant unsupervised access to Ancora's grounds for any period of time. The court is empowered to make this ruling while balancing Calu's right to treatment with community safety. It is uniquely the judge's responsibility to devise an order permitting the maximum treatment and ensuring public safety. *Id.* at 302–03, 390 *A.*2d 574. That is exactly what Judge DeMartin did, and he had the clear authority to do so.

### III.

Calu argues that the Mercer County Prosecutor improperly participated in the 1995 *Krol* hearing. The prosecutor did not represent the State, Ancora or the Patient Review Board. Calu asserts that his NGI acquittal has turned what was originally a criminal matter into a civil one. According to Calu, the prosecutor, therefore, has no standing to take over the responsibility of establishing the continuing need for confinement.

*N.J.S.A.* 30:4–27.12 concerns hearings on the issue of the continued need for involuntary commitment. The statute states in pertinent part:

b. Except as provided in subsection c. of this section, the assigned county counsel is responsible for presenting the case of the patient's involuntary commitment to the court, unless the county adjuster is licensed to practice law in this State, in which case the county adjuster shall present the case for the patient's involuntary commitment to the court.

c. Notwithstanding the provisions of subsection b. of this section and upon notice to the county adjuster:

(1) The Attorney General, or the county prosecutor acting at the request of the Attorney General, may supersede the county counsel or county adjuster and assume responsibility for presenting any case for involuntary commitment or may elect to participate with the county counsel or county adjuster in presenting any such case; and

(2) The county prosecutor may supersede the county counsel or county adjuster and assume responsibility for presenting any case for involuntary commitment initiated by the county prosecutor pursuant to subsection c. of section 10 of P.L.1987, c. 116 (C. 30:4–27.10) or may elect to participate with the county counsel in the presentation of any such case.

The statute clearly provides that the prosecutor may appear at an involuntary commitment hearing either at the request of the Attorney General after notification to county counsel or if this was the prosecutor who initiated the hearing under *N.J.S.A.* 30:4–27.10. Calu's proceeding was originally initiated by the prosecutor because it stemmed from the murder indictment and the NGI involuntary commitment. Furthermore, *N.J.S.A.* 2C:4–8 affords the prosecutor the opportunity to "appear and be heard" at any periodic review proceeding following an NGI involuntary commitment. Thus, the prosecutor clearly has standing to be responsible for establishing the need for continued confinement.

On the record before us, the Mercer County Prosecutor representative was unclear as to what role she was to take at Calu's *Krol* hearing. Should, however, the prosecutor decide to continue to appear at any future periodic review proceeding, the prosecutor should coordinate with the county counsel or county adjuster to decide who shall assume the responsibility for presenting the State's case for continuation of the involuntary commitment. The lines of responsibility should be clearly drawn so that there is no confusion or misunderstanding by any of the participants or the court. That is what is contemplated by *N.J.S.A.* 30:4–27.12c read in conjunction with *N.J.S.A.* 2C:4–8b(3).

The appeal is dismissed.