706 A.2d 1116

IN THE MATTER OF THE CIVIL COMMITMENT OF G.A.

Superior Court of New Jersey
Appellate Division

Argued January 21, 1998—Decided February 17, 1998.

Before Judges DREIER, KEEFE and WECKER.

*Joseph Del Russo*, Senior Assistant Prosecutor, argued the cause for appellant (*Ronald S. Fava*, Passaic County Prosecutor, attorney; *Mr. Del Russo*, of counsel and on the brief).

*David Simon*, argued the cause for G.A.

The opinion of the court was delivered by

DREIER, P.J.A.D.

The Passaic County Prosecutor appeals from a Law Division order denying his request to have the court direct a psychiatric examination of G.A., an individual who had been civilly committed following the termination of an extended jail term. During a period of apparent improvement, G.A. had been placed on a status denominated Conditional Extension Pending Placement (CEPP), and granted Level 3 privileges, enabling him to enjoy home visits and supervised work opportunities. Thereafter G.A. was accused of sexually assaulting a female patient and was arrested for possession of marijuana and alcohol, causing his downgrade to Level 1 status. Eventually, his condition improved and Level 3 freedoms were restored. The prosecutor opposed G.A.'s CEPP status and requested that he be involuntarily committed. To support his challenge, the prosecutor requested a psychiatric examination of G.A. by a psychiatrist appointed by the prosecutor. The judge denied the motion and this appeal ensued. We note at the outset that this case and our discussion in no way implicates the court's inherent power, recognized by *N.J.R.E.* 614, itself to appoint and call an independent expert witness.

After a February 1978 indictment, G.A. was convicted of rape, rape while armed, and assault with intent to commit sodomy. He was sentenced to consecutive terms aggregating sixteen to nineteen years. G.A.'s prison term expired on January 8, 1995, but three days prior to his scheduled release, the court granted the State's request for a temporary order of commitment pursuant to *N.J.S.A.* 30:4–27.10, and involuntarily committed G.A. temporarily to Trenton Forensic Hospital. On February 23, 1995, G.A. was transferred to a less restrictive setting at Greystone Park Psychiatric Hospital, where he currently resides.

On April 11, 1995, the hearing judge approved an order placing G.A. on CEPP based on testimony that revealed that he did not meet the criteria for continued commitment by clear and convincing evidence. Upon application by the prosecutor, the court stayed its April 11, 1995 order to allow him to present supplemen-

tal evidence as to G.A.'s need for involuntary commitment. Specifically, the court granted the prosecutor the opportunity to conduct an independent psychiatric evaluation of G.A. On May 16, 1995, based on supplemental evidence, the court found that G.A. suffered from a mental illness which caused him to be a danger to himself and to others, hence the court ruled that G.A. should remain involuntarily committed pending a new hearing.

On April 16, 1996, noting from a psychiatrist's report that G.A.'s behavior had improved and that he was complying with medication orders, the judge placed him on CEPP and approved an order granting him Level 3 privileges. Under this status, G.A. was given increased privileges such as the right to attend work in training under supervision and home visits. The prosecutor requested a stay of the April 16, 1996 order, but the court denied the motion. Soon G.A. began home visits.

On September 4, 1996, police were called to Greystone to investigate a report that G.A. had sexually assaulted a female patient. G.A. admitted to having consensual physical contact with the female patient, but he denied having sexual intercourse with her. He was not formally charged because the female patient was found to be mentally incompetent and unable to provide consistent testimony. While this allegation was being investigated, G.A.'s Level 3 privileges were suspended.

G.A. was evaluated on October 17, 1996, and diagnosed with schizophrenia, chronic paranoid type in partial remission (showing no signs and symptoms of schizophrenia for at least one year). Dr. Gooriah, the staff psychiatrist, noted that because of G.A.'s prior history of noncompliance with his medication, "should [G.A.] be discharged into the community there is a risk of his decompensation." Yet, one month later Dr. Gooriah testified at a hearing that G.A. did not satisfy the criteria for being involuntarily committed. Consequently, she found no reason why his visitations should not resume.

On November 13, 1996, the judge signed an order restoring Level 3 privileges to G.A., thereby allowing him to restart week-

end visits with his sister and home visits beginning November 15, 1996. Later that month he was arrested for possession of a controlled dangerous substance, namely marijuana in violation of *N.J.S.A.* 2C:35–10a(4), and possession of an alcoholic beverage in violation of *N.J.S.A.* 2C:29–6b. As a result, his privileges were revoked on November 30, 1996.

On February 25, 1997, the prosecutor moved for an order to reevaluate G.A.'s mental condition and to subject him to a separate evaluation by a psychiatrist selected by the prosecutor to determine whether G.A. is presently mentally ill and dangerous and thus requiring involuntary commitment. The court granted the prosecutor's request for a reevaluation of G.A.'s mental condition, but without pointing to specific statutory authority, the hearing judge refused to acknowledge the prosecutor's power to obtain such a psychiatric examination of G.A. apart from the initial involuntary commitment proceeding.

In denying the prosecutor the right to compel a separate psychiatric examination, the hearing judge stated that "the Court has to proceed cautiously in how much [rein], if you will, is given to the Prosecutor's Office." Further, he expressed a desire to avoid a "battle of the experts or the hired guns" situation. Although the hearing judge recognized the prosecutor's role in the initial proceedings, the court found that "the right to civilly commit and to have independent psychiatric examination is limited to those situations provided for by the statute." He expressed doubt that "the purpose of the statute is that at any stage to be giving the Prosecutor that right that it has initially to move for the independent evaluation examination of inmates or citizens when the patient is already at the hospital as a patient here and it's a matter of record."

On March 17, 1997, two treating psychiatrists at Greystone concluded that G.A. was a danger to himself, others and property. An order for a temporary period of commitment was then issued on March 18, 1997. After his recommitment, G.A. was diagnosed with schizophrenia, chronic paranoid type, and he was involved in

an incident where he entered a restricted area and verbally threatened a nurse. Consequently, Dr. Gooriah opined that G.A. was a danger to others, to property and to himself, and as such he should be committed to Greystone until his condition stabilized. On April 8, 1997, due to G.A.'s declining mental condition, the court signed a civil commitment order involuntarily recommitting him to Greystone. The prosecutor filed a notice of appeal on April 5, 1997, as to the State's right to retain an independent psychiatric evaluation of an individual on CEPP status.

█ The prosecutor argues that the hearing judge erred in concluding that the State may not order an independent psychiatric evaluation of G.A. once the civil commitment has been initiated. The prosecutor relies on *N.J.S.A.* 30:4–27.10 and *N.J.S.A.* 30:4–82.4 as support for his assertion that the State may compel an individual to submit to a psychiatric evaluation by a psychiatrist of the State's own choosing after the initial involuntary commitment. Although these statutes are silent regarding a prosecutor's authority to mandate psychiatric evaluations beyond the initial involuntary commitment hearing, the prosecutor maintains that this right is implicit in the language and purpose of the statutes.

█ As part of the 1994 amendments to *N.J.S.A.* 30:4–27.10, the Attorney General, in exercise of the State's authority as *parens patriae,* may initiate a court proceeding for involuntary commitment of an inmate scheduled for release after serving the maximum term of incarceration. *N.J.S.A.* 30:4–27.10d. This statute provides that

> [w]hen the Attorney General determines that the public safety requires initiation of a proceeding pursuant to subsection b. of this section, *the Attorney General may apply to the court for an order compelling the psychiatric evaluation of the person.* The court shall grant the Attorney General's application if the court finds that there is reasonable cause to believe that the person may be in need of involuntary commitment. The Attorney General may delegate the authority granted pursuant to this subsection, on a case by case basis, to the county prosecutor.
>
> [*Ibid.* (emphasis added) ].

Thus, it is clearly within a prosecutor's power to initiate an involuntary commitment proceeding in the interest of public safety

and subject a released inmate to a psychiatric evaluation. *In the Matter of D.C.*, 146 *N.J.* 31, 55, 679 *A*.2d 634 (1996).

The ability of the Attorney General or a county prosecutor to order an independent psychiatric evaluation to determine whether involuntary commitment is necessary is particularly applicable to inmates convicted of sexual offenses. Under *N.J.S.A.* 30:4–82.4, when an inmate who has been convicted of aggravated sexual assault, sexual assault or aggravated criminal sexual contact is scheduled for release after serving the maximum term, the Attorney General may initiate proceedings to determine whether the inmate is in need of involuntary commitment. If the Attorney General or a county prosecutor suspects that an involuntary commitment is required, the Commissioner of Corrections or the Juvenile Justice Commission, upon request of the Attorney General or county prosecutor, shall "[p]ermit persons qualified to execute clinical certificates necessary for civil commitment to examine the inmate in the institution in which he is confined," or "arrange for persons qualified to execute clinical certificates necessary for civil commitment to examine the inmate." *N.J.S.A.* 30:4–82.4e(1) and (2).

While the State's right to initiate a civil commitment hearing and order an independent psychiatric evaluation is supported by statute, the question is whether this right extends to a situation where the patient has been placed on CEPP status. Neither the statute detailing the procedures for hearings on the continuing need for involuntary commitment, *N.J.S.A.* 30:4–27.12, nor the Rules Governing Civil Practice provide guidance in this area of the law. In setting forth the general discovery guidelines for civil commitments, *R.* 4:74–7(d) states that the court may "order testing or examination of the patient by an independent psychiatrist, psychologist or other expert." The same ability to order an independent psychiatrist is not, however, discussed in the discovery procedures for CEPP hearings. Instead, discovery orders generally remain within the discretion of the court. At CEPP hearings, the court must inquire into and receive such evidence of

a patient's placement "as is necessary to support the entry of an order conditionally extending the patient's hospitalization." *R.* 4:74–7(h)(2). Although no New Jersey case has addressed this issue, an examination of the statute governing the discharge procedures for involuntarily committed individuals is instructive.

The State's power to compel a separate psychiatric examination may be exercised before a committed person is discharged. After receiving notice that a patient is no longer in need of involuntary commitment, the Attorney General or a county prosecutor who was involved in the initial commitment may file a request for a hearing on the issue of the continuing need for commitment. *N.J.S.A.* 30:4–27.17b. The administrative discharge is then postponed, and the court must schedule a hearing on the issue. *Ibid.* Implicit in this statute is the ability of the party opposing the discharge to set forth proof of the reasons supporting the continuing need for involuntary commitment.

The form of such proof is dictated by *N.J.S.A.* 30:4–27.13. In a hearing on the need for involuntary commitment, the patient's psychiatrist who has conducted a personal examination of the committee must testify. *N.J.S.A.* 30:4–27.13b. In addition, "[o]ther members of the patient's treatment team and *any other witness with relevant information offered by the patient or the persons presenting the case for civil commitment shall also be permitted to testify at the hearing.*" *Ibid.* (emphasis added). Certainly an evaluation by a separate psychiatrist produced by a prosecutor, regarding the mental state of a patient would be relevant, especially if the testimony had the potential to clarify another expert's contradictory findings. Thus, this statute seems to sanction the ability of the Attorney General or a county prosecutor who initiated the civil commitment proceeding to evaluate the patient independently and then present to the court the relevant testimony on the need for involuntary commitment. *Cf. In re Gannon,* 123 *N.J.Super.* 104, 106, 301 *A.*2d 493 (Cty.Ct.1973) (finding that in a hearing to contest the application for involuntary commitment

the State must provide an indigent patient with an evaluation by an independent psychiatrist).

If G.A. were to be discharged, the prosecutor could file a new proceeding and mandate an independent psychiatric examination. The prosecutor therefore presents a persuasive argument for recognizing the same power in the present situation where the State contests G.A.'s CEPP status, which affects the public similarly to a discharge. The prosecutor seeks the patient's return to a status that will not affect the public. Although a patient under CEPP status is not granted complete liberty, the patient is permitted to have contact with the community. It is this release into society, the prosecutor argues, that triggers the State's *parens patriae* power to order an independent expert to evaluate patients like G.A.

Even if we approach this problem from another direction, a review of the purpose of the involuntary commitment statutes and the State's *parens patriae* power, the analysis reveals a strong basis for granting the prosecutor's request for an independent psychiatric evaluation. The purpose and intent of the 1994 amendments were to protect the public from dangerous sexual and other violent offenders who have completed their maximum sentences but suffer from a mental illness that renders them dangerous to themselves and others. *L.* 1994, *c.* 134, § 1. *See generally* Claudine M. Leone, *New Jersey Assembly Bill 155—A Bill Allowing the Civil Commitment of Violent Sex Offenders After the Completion of a Criminal Sentence,* 18 *Seton Hall Legis. J.* 890, 896 (1994). In furtherance of this purpose, the State should be given the opportunity to evaluate a patient on CEPP through an independent psychiatrist, so that evidence in which the prosecutor has confidence can be presented to the court, especially where the hospital recommends discharge or CEPP status. Without the ability to present contrary testimony supporting its position for involuntary commitment, the State's competence to challenge a patient's CEPP status would be hampered, thus possibly resulting

in the temporary discharge of a potentially dangerous sex offender into the community.

The importance of granting the prosecutor the right to compel an independent evaluation to challenge a committee's CEPP status is even clearer when considered under the facts in this case. Here, after G.A. was convicted of rape and subsequently involuntarily committed to Greystone, his sexual preoccupations and deviant behavior continued. While on CEPP, there were allegations that he sexually assaulted a female patient. Further, during one of his home visits G.A. was arrested for possession of marijuana and possession of alcohol. G.A.'s history shows that he is probably not a strong candidate for greater privileges under CEPP. Even Dr. Gooriah, the treating psychiatrist who testified that G.A. should be granted CEPP status, seemed unsure about his ability to handle a less restrictive setting. Although she testified on November 12, 1996 that G.A. did not meet the criteria for involuntary commitment, one month earlier she noted in a report that if he should be discharged into the community, there was a risk that his mental condition would decompensate.

Only the prosecutor's insistence on independent proof could protect the public in this or another case where the patient might become violent, but such proclivity was not recognized by the institution's experts. Arguably, cross-examination of a testifying expert could clarify confusion, but in cases where the State disagrees with the expert's diagnosis and there are sufficient grounds for such an objection, the State should be given the right to by-pass the contradictory opinion of institutional psychiatrists and order an independent psychiatric examination to protect the public from even the temporary release of potentially dangerous sex offenders. *See In the Matter of D.C.*, 281 *N.J.Super.* 102, 122, 656 *A.*2d 861 (App.Div.1995), (Shebell, P.J.A.D., dissenting), *rev'd on other grounds*, 146 *N.J.* 31, 679 *A.*2d 634 (1996).

The State's right to order an independent evaluation of a patient on CEPP status is also supported by the Attorney General's broad powers to act in the interests of public safety. Drawing from the

parens patriae theory, the Attorney General has a common law responsibility to act on behalf of the State to protect its citizens who cannot protect themselves because of an innate disability, such as minority, mental illness or incompetency. *In re D.C., supra,* 146 *N.J.* at 47–48, 679 *A.*2d 634. The Attorney General's powers as *parens patriae* have been specifically marshalled through the 1994 amendments which state that the Attorney General is authorized "to seek civil commitment when the public safety requires." *Id.* at 44, 679 *A.*2d 634 (quoting *Sponsor Statement to Assembly Bill No. 86,* at 1 (Sept. 26, 1994)). Thus as "protector of the public interest" the State should be allowed to challenge a patient's CEPP status and order independent psychiatric evaluations to prevent potentially dangerous sex offenders from enjoying liberties they are unable to handle.[1]

In defense, G.A. argues that because he is still under investigation for the alleged sexual assault of a female patient, appointment of an independent psychiatrist would violate his Fifth Amendment right against self-incrimination. This argument, however, is without merit. Under *N.J.S.A.* 30:4–82.4h(2), disclosure of information related to an inmate's commitment or release is limited to the use of determining the need for involuntary commitment. The use immunity concept, restricting the use of inculpatory statements made during a psychiatric examination, is well established. *State v. Whitlow,* 45 *N.J.* 3, 26, 210 *A.*2d 763 (1965) clearly states that "inculpatory statements shall be limited expressly to the claim of insanity, and shall not be admissible on the issue of guilt." *See also State v. Obstein,* 52 *N.J.* 516, 531, 247 *A.*2d 5 (1968), *overruled on other grounds, State v. Williams,* 93 *N.J.* 39, 459 *A.*2d 641 (1983). Therefore, requiring G.A. to submit

---

[1] We are aware of the strong public interest in the outcome of this litigation. The general public is gravely concerned about the possibility that a sex offender who may be mentally ill and dangerous to himself or others may be released from a treatment facility, even if such freedom is on a temporary basis. See *L.* 1994, *c.* 134, § 1, where the Legislature declared the necessity for reaffirming and clarifying the statutory standards for civil commitment to ensure that the full benefits of involuntary civil commitment law are realized.

to an independent psychiatric examination does not violate his protection against self-incrimination.

In sum, in accordance with broad discovery guidelines in court hearings to determine the need for involuntary commitment, both initially and prior to discharge, the prosecutor should be allowed to order an independent psychiatric evaluation of G.A. to determine whether a more restrictive involuntary civil commitment status should be reinstated instead of G.A. being placed on CEPP. The prosecutor's arguments for reinstatement of such a status are no different from the arguments that the State would make in an initial commitment hearing or when contesting the discharge of G.A. As in the initial and discharge hearings, the prosecutor would attempt to prove that the patient is a danger to himself, others and property. If the State's proofs were restricted to the testimony of the patient's treating psychiatrist, a prosecutor's ability to argue for involuntary recommitment would be severely curtailed, especially if, as in this case, the treating psychiatrist presented contrary and inconsistent testimony. Consequently, we determine that a prosecutor shall be permitted to contest a patient's CEPP status by presenting any witness with relevant information on the subject of involuntary recommitment, including an evaluation by an independent psychiatrist.

Lastly, we determine that the issue before this court is not moot because of G.A.'s recommitment. The issue of whether the State can introduce its own expert witness at a hearing to determine whether a patient should receive even restricted release into the community is of public importance and of substantial concern to the public interest. The prosecutor correctly maintains that because the issue before this court is capable of repetition, this court should render a decision to provide guidance to the trial courts, and to the Attorney General and the county prosecutors.

Even where a controversy is technically moot, we may nevertheless grant judicial review where a broad public interest is at stake and the circumstances giving rise to the litigation are likely to recur. *In the Matter of the Application for the Commit-*

*ment of Geraghty,* 68 *N.J.* 209, 212, 343 *A.*2d 737 (1975). For example, recently in *In the Matter of the Commitment of Calu,* 301 *N.J.Super.* 20, 693 *A.*2d 911 (App.Div.1997), this court addressed the issue of mootness in the context of an involuntary commitment proceeding. The patient in *Calu* appealed from an order denying the less restrictive conditions that were recommended by the patient's treatment team. *Id.* at 22, 693 *A.*2d 911. Before the appeal was calendared, a *Krol* hearing took place and the trial court issued its decision, concluding that the patient was mentally ill and likely to pose a danger to himself and society. *Id.* at 23, 693 *A.*2d 911. Because there was a subsequent review hearing with an entry of an order removing the disputed privileges, we found that the patient's arguments relating to the less restrictive conditions were mooted. *Id.* at 23–24, 693 *A.*2d 911. However, because there were other issues that were likely to surface at future *Krol* review hearings, we adjudicated those issues. *Id.* at 24, 693 *A.*2d 911. As in *Calu,* there is here the unresolved matter of whether the State generally is allowed to order a patient to submit to an independent psychiatric exam while he is on or being considered for CEPP status. This issue will most likely be revisited in this case or other involuntary commitment hearings under *N.J.S.A.* 30:4–27.10. Therefore, there is persuasive authority supporting our rendering a decision to guide future litigation.

The order denying the State's request for its independent psychiatric examination is reversed. The State is entitled to compel a patient on or being considered for CEPP status to submit to a psychiatric evaluation requested by the prosecutor to determine whether he should continue to be retained under more restrictive control.