# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0306-21

IN THE MATTER OF THE
CIVIL COMMITMENT OF
T.K. SVP-286-02.

_____

Argued October 3, 2022 – Decided October 24, 2022

Before Judges Currier and Enright.

On appeal from the Superior Court of New Jersey, Law Division, Atlantic County, Docket No. SVP-286-02.

Michael Mangels, Assistant Deputy Public Defender, argued the cause for appellant T.K. (Joseph E. Krakora, Public Defender, attorney; Susan Remis Silver, Assistant Deputy Public Defender, on the briefs).

Stephen Slocum, Deputy Attorney General, argued the cause for respondent State of New Jersey (Matthew J. Platkin, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Stephen Slocum, on the brief).

PER CURIAM

Appellant, T.K.,[1] appeals from the June 10, 2021 order denying his request for a promotion in his treatment phase at the State of New Jersey Special Treatment Unit (STU).[2] For the reasons that follow, we affirm.

T.K. is fifty-three years old and has a significant history of committing sexual offenses against prepubescent minors. As we noted in our prior unpublished opinion:

> The first incident occurred when [T.K.] was thirteen years of age when he had sexual intercourse with an eight[-]year[-]old child. He was adjudicated delinquent and placed on probation for one year with the requirement that he obtain counseling. The second incident occurred [i]n . . . 1998. The victim was his girlfriend's seven[-]year[-]old daughter. He was charged with sexual assault and endangering the welfare of a child. . . . [H]e pled guilty to endangering the welfare of a child and was placed on five years probation. The third incident occurred [i]n . . . 1999. . . . [when T.K.] sexually assaulted his two[-]year[-]old daughter while changing her in a public restroom. He pled guilty to second[-]degree sexual assault and was sentenced to five years imprisonment.
>
> [In re Commitment of T.[]K., No. A-0510-03 (App. Div. Jan. 20, 2006) (slip op. at 2-3).]

---

[1] We use initials to protect the privacy of the child victims. R. 1:38-3(c)(9).

[2] The STU is the State's designated facility for the custody, care, and treatment of sexually violent predators.

A-0306-21

In December 2002, the State petitioned for T.K.'s involuntary commitment under the Sexually Violent Predator Act (SVPA), N.J.S.A. 30:4-27.24 to -27.38. Later that month, the trial court entered a temporary commitment order, and in August 2003, the court committed T.K. involuntarily to the STU

> based on a finding he suffers from a mental abnormality in the form of pedophilia, paraphilia not otherwise specified, personality disorder not otherwise specified, narcissistic personality, and . . . has a history of alcohol and cocaine abuse; the trial court also found [T.K.] was highly likely to reoffend if not committed.
>
> [In re Civ. Commitment of T.[]K. No. A-2249-10 (App. Div. Apr. 29, 2011) (slip op. at 3).]

Since 2003, T.K.'s commitment to the STU has been reviewed annually and continued. His most recent review hearing occurred in April 2021 and resulted in the entry of the June 10 order.

During his April 2021 hearing, T.K. stipulated to his continued commitment at the STU but argued he should be assigned to treatment Phase 3A, rather than Phase 2, as a resident of the STU.[3] The State opposed T.K.'s

---

[3] As explained in the Residents' Guide to the STU, the treatment phases are as follows: Phase 1 represents orientation, as new residents adapt to the trauma of being civilly committed. Phase 2 represents the rapport-building phase, as residents begin to engage in treatment, before core sex-offender specific treatment. Phase 3, subdivided into Phases 3A and 3B, represents core sex-offender specific treatment. Phase 4 corresponds to maintenance of treatment

request and urged the judge to keep T.K. in Phase 2. It relied on a report from psychiatrist, Dr. Marta Scott, as well as a report and expert testimony from psychologist Dr. Nafisa Mandani, to support its argument. T.K. provided testimony from psychologist Dr. Christopher P. Lorah to support his request for a promotion to Phase 3A.

As she began her direct examination, Dr. Mandani stated she was a member of the Treatment Progress Review Committee (TPRC)[4] at the STU, and "in [her] role" as a member of the TPRC, she was "familiar with [T.K.]." Further, Dr. Mandani testified she conducted an annual review of T.K.'s treatment progress in February 2021, the month before she generated her report. Additionally, she stated if she "were to testify to the full content of [her] report," her "testimony [would] conform with it."

concepts learned and internalized in the prior phases, and discharge planning. Phase 5 provides for transition into the community.

[4] Dr. Mandani testified "[t]he TPRC is a committee which reviews the resident's progress as well as assesses their risk and makes recommendations for treatment and for commitment." According to her report, which was admitted into evidence as "P-4," "members of the [TPRC] are psychologist[s] employed by the Department of Health at the [STU]."

A-0306-21

According to Dr. Mandani, the TPRC unanimously recommended that T.K. "be maintained in Phase 2 of treatment." She also stated "[t]he TPRC's recommendation [was] consistent with that of [T.K.'s] Treatment Team."

By way of background, Dr. Mandani testified that when T.K. was first committed to the STU in 2002, he began Phase 1 of his treatment. His participation in group programming was "infrequent" and he was found to "minimiz[e] his offending behavior." With increased engagement, he was promoted to Phase 2, where he remained for "multiple years." Dr. Mandani stated that by 2010, after T.K. "did some programmatic requirements, and . . . remained active in substance abuse programming, . . . he was advanced to [P]hase [3]." The doctor stated T.K. "did respond well to the phase advancement at that time," but she added, "mind you now, that was one decade ago."

According to Dr. Mandani, although T.K. remained in Phase 3 for almost ten years, "his motivation continued to fluctuate." She noted T.K. "would get angry when challenged in group. He would use profanity. His group members thought that he was intimidating and aggressive." Further, Dr. Mandani reported T.K. was "talking on the phone and engaging with women and then sending money to them."

5

T.K. was placed on treatment probation in 2014. Due to his failure to meet treatment goals, "he was placed on treatment refusal status." In 2015, T.K. was placed in a Cognitive Life Skills (CLS) process group, comprised of individuals with cognitive limitations. Dr. Mandani explained T.K. suffers from "borderline intellectual functioning," so his placement in the CLS group provided him with assistance "at a slower pace."

Despite TPRC's concerns about T.K.'s behavior, and that T.K.'s treatment team "recommended demotion, . . . the TPRC felt like [T.K.] . . . was working on [his core issues] and allowed him to remain in Phase 3." Dr. Mandani reported that as T.K. continued in this phase,

> [h]e . . . made statements that he was having fantasies of killing children and staff. He refused to put any interventions in place for these fantasies. He said that he was watching TV shows with young children and . . . he had been sexually acting out when he was . . . in the main unit and he was also found to be in possession of pictures of . . . young children between the ages of [two] and [eight].

Dr. Mandani further noted that in 2018, T.K. was placed in the Modified Activities Program (MAP),[5] after he accused another resident in the unit of

---

[5]  The MAP, "a component of the clinical treatment program at the STU that focuses on stabilizing disruptive or dangerous behaviors," is a behavior-related treatment modality. M.X.L. v. N.J. Dep't of Hum. Servs./N.J. Dep't of Corr., 379 N.J. Super. 37, 45 (App. Div. 2005).

sexually assaulting him, but then admitted "he had . . . a history of consensual sexual activity with that resident."

According to Dr. Mandani, after T.K. returned from MAP, "his treatment team felt like he was not demonstrating any positive therapeutic change." Therefore, "after several years of . . . lag and stagnation and . . . struggling in treatment, [T.K.] was demoted to [P]hase [2] at the . . . TPRC review of 2020."

Dr. Mandani testified that once T.K. was demoted to Phase 2, he expressed motivation and increased engagement in his treatment, but he also "lashed out" at his treatment provider on a couple of occasions. The doctor acknowledged T.K.'s treatment provider was able to "redirect[]" T.K. when he reacted out of anger toward her, but "his treatment team continued to have concerns with regards to [T.K.] being on the phone[,] talking to women and sending them money, so they . . . discussed money management with him."

Although T.K. increased his treatment participation between August 2020 and April 2021, due to his history at the STU, his treatment providers and the TPRC unanimously determined Phase 2 was an appropriate phase for him until he could demonstrate "a longer period of stability and motivation and engagement." Dr. Mandani opined T.K.'s placement in Phase 2 was warranted because T.K.'s "behavior . . . over the last several years demonstrates that he is

7

not utilizing the concepts that he's learned over the years. He's not able to integrate them, not able to utilize them."

When Dr. Lorah testified, he opined the STU failed to account for T.K.'s limited cognitive functioning when assessing his motivation level. The doctor also believed T.K.'s motivation to engage in treatment would be enhanced by a promotion to Phase 3A. He highlighted that T.K. was in Phase 3A "for the better part of a decade." Therefore, he concluded a return to that phase would not be "detriment[al] at all." Further, Dr. Lorah testified the STU was "inappropriately focusing on [T.K.'s] financial responsibility and using that as an incorrect . . . way to maintain his phase demotion." Additionally, the doctor opined money management skills are not relevant to T.K.'s "risk for sexual recidivism," and in any event, T.K. "made strides" with his money management skills by saving money in his account and limiting the amount of money he gave to his girlfriend.

Moreover, Dr. Lorah testified that once T.K. was demoted to Phase 2 in 2020, he "significantly engaged in treatment" and "applied" and "internalized his anger management techniques." For example, he noted that if T.K. became angry during treatment, he "calm[ed] immediately and seemingly apologize[d], recogniz[ing] what he did was inappropriate, and then move[d] forward."

A-0306-21

After reiterating T.K. would "be motivated by phase advancement," Dr. Lorah concluded T.K. had "done enough in the last year to be promoted to [P]hase [3]" and there would be no "harm to the STU or to T.K. by engaging [T.K.] in a phase advancement." Dr. Lorah opined, too, that advancing T.K. to Phase 3A would allow him to earn more money, as residents in that phase have better work opportunities. Further, he anticipated T.K.'s ability to earn more money would "serve as an external motivator for" T.K.

At the conclusion of the April 7 hearing, the judge invited counsel to brief the issue regarding who bore the burden of establishing T.K.'s appropriate treatment phase and what the burden of proof was on that limited issue. On June 10, after receiving the parties' briefs, the judge held a second hearing to render an oral opinion on all outstanding issues.

First, the judge found the State established by clear and convincing evidence that T.K. was "highly likely to sexually re-offend and is in need of confinement and treatment." The judge based his findings on Dr. Scott's "unrebutted" expert report, Dr. Mandani's testimony and report, and T.K.'s stipulation that his commitment was necessary.

Turning to the issue of whether T.K. should remain in Phase 2 or be promoted to Phase 3A, the judge concluded T.K. bore the burden of proving by

a preponderance of evidence he was entitled to the promotion, and T.K. failed to meet that burden. The judge explained that while he found Drs. Mandani and Lorah credible, he afforded greater weight to Dr. Mandani's opinion due to her "greater familiarity with [T.K.,] as well as a greater familiarity with the programs offered by the STU." Further, he found Dr. Mandani "set[] forth the more logical, better suited treatment plan for [T.K.]." The judge entered a conforming order that day, denying T.K.'s request for a promotion to Phase 3A.

On appeal, T.K. contends "the trial court engaged in reversible error when it imposed the burden of proof on T.K. to demonstrate . . . he had an inappropriate restraint level in the STU."[6] We disagree.

To provide context for our decision, we note "'[t]he scope of appellate review of a commitment determination is extremely narrow.'" In re Civ. Commitment of R.F., 217 N.J. 152, 174 (2014) (quoting In re D.C., 146 N.J. 31, 58 (1996)). "The judges who hear SVPA cases generally are 'specialists' and 'their expertise in the subject' is entitled to 'special deference.'" R.F., 217 N.J. at 174 (citing In re Civ. Commitment of T.J.N., 390 N.J. Super. 218, 226 (App. Div. 2007)).

---

[6] T.K. also raises new arguments in his reply brief, which we do not consider. See A.D. v. Morris Cnty. Bd. of Soc. Servs., 353 N.J. Super. 26, 30-31 (App. Div. 2002) ("It is improper to raise an argument for the first time in a reply brief. Typically, such an argument will not be recognized." (citations omitted)).

Therefore, "an appellate court should not modify a trial court's determination either to commit or release an individual unless 'the record reveals a clear mistake.'" Id. at 175 (quoting D.C., 146 N.J. at 58). However, when an appeal presents issues of law, "the relevant standard of review is de novo." In re Civ. Commitment of D.Y., 218 N.J. 359, 373 (2014) (citations omitted).

"The SVPA authorizes the involuntary commitment of an individual believed to be a 'sexually violent predator' as defined by the Act. The definition of 'sexually violent predator' requires proof of past sexually violent behavior through its precondition of a 'sexually violent offense.'" In re Commitment of W.Z., 173 N.J. 109, 127 (2002) (citation omitted). It also requires that the person "'suffer[] from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined in a secure facility for control, care and treatment.'" Ibid. (quoting N.J.S.A. 30:4-27.26). "[T]he mental condition must affect an individual's ability to control his or her sexually harmful conduct." Ibid.

"Commitment proceedings under the SVPA are civil in nature." In re Civ. Commitment of D.L., 351 N.J. Super. 77, 90 (App. Div. 2002). Evidence at commitment hearings "generally consist[s] of extensive psychological or psychiatric testimony, as well as evidence of actuarial risk assessments." Ibid.

"The final decision whether a person previously convicted of a sexually violent offense is highly likely to sexually reoffend 'lies with the courts, not the expertise of psychiatrists and psychologists. Courts must balance society's interest in protection from harmful conduct against the individual's interest in personal liberty and autonomy.'" R.F., 217 N.J. at 174 (citing D.C., 146 N.J. at 59). As the fact finder at the commitment or review hearing, "[a] trial judge is 'not required to accept all or any part of [an] expert opinion'" but may "place[] decisive weight on [the] expert." Id. at 156, 174 (citations omitted).

The same standard that supports the initial involuntary commitment of a sex offender under the SVPA applies to the annual review hearing. See In re Civ. Commitment of E.D., 353 N.J. Super. 450, 452-53 (App. Div. 2002). Thus, in an initial or subsequent review hearing, the State must present "clear and convincing evidence that the person [at issue] needs continued involuntary commitment." N.J.S.A. 30:4-27.32(a).

Confinement by the State under the legal standard set forth in W.Z. "invokes a correlative statutory and constitutional duty of appropriate treatment where feasible, designed to permit ultimate release to the community." In re Commitment of K.D., 357 N.J. Super. 94, 97-98 (App. Div. 2003) (citations omitted). Thus, the SVPA charges the Division of Mental Health Services with

12

providing treatment for the committee.  Id. at 98-99.  "'Such treatment shall be appropriately tailored to address the specific needs of sexually violent predators.'"  Id. at 99 (quoting N.J.S.A. 30:4-27.34(b)).

"[C]ommittees have the right to present evidence" at review hearings "on the issue of whether or not they have been receiving appropriate treatment, especially in light of any particular disability which might exist."  Id. at 98.  In K.D., we further concluded trial courts have the inherent power to examine the conditions of confinement and treatment recommended for an SVPA committee. Id. at 99.  But we cautioned:

> We certainly do not suggest that any individual commitment review hearing be converted into a challenge to the sexual offender's treatment program . . . .  Such a challenge must be brought in a plenary individual or class action in the regular trial courts, state or federal, and not in a particular committee's individual initial or annual review hearing under the SVPA, the purpose of which is to decide if confinement under the SVPA and W.Z. standards is proper.
>
> [Id. at 99 (emphasis added).]

In anticipation of a committee pursuing a challenge to his or her treatment and "offer[ing] proof of reasonable alternatives," we also provided the following guidance:

> [The committee] <u>must give proper notice of his intentions, with specifics, sufficiently in advance of the hearing to permit the State to meet this challenge</u>. We add . . . that a committee under the SVPA need not wait a year for an annual review hearing to challenge his diagnosis and treatment, but <u>may move at any time after the initial hearing for a prompt hearing on the claim of specific needs geared to the particular situation</u>.
>
> [<u>Id.</u> at 99-100 (emphasis added).]

Considering the principles we outlined in <u>K.D.</u>, we are satisfied T.K. was obliged to challenge the appropriateness of his treatment phase in a separate plenary action, and as the movant, he was required to notify the State prior to the hearing about the basis for his challenge so the State had the opportunity to respond to T.K.'s claims.

The record reflects that here, the State knew before the April 2021 review hearing began that T.K. would stipulate to his continued commitment but wished to contest his phase assignment. It is equally apparent the State was prepared to meet T.K.'s application for a promotion in phase assignment and to counter Dr. Lorah's testimony with its own expert reports and testimony. Therefore, we understand why the judge allowed the parties' counsel to produce evidence and testimony at T.K.'s annual review hearing about the appropriate level of T.K.'s treatment phase. Nevertheless, we remind the parties, and trial courts in general,

14

that annual review hearings ordinarily should not be converted into hearings to consider a committee's challenge to his treatment at the STU.

We hasten to add that because T.K. "may move at any time" to contest his treatment, he must have a good faith basis for doing so. And should he avail himself of this opportunity, T.K., like other movants in civil matters who affirmatively seek relief, bears the burden to establish entitlement to the relief he seeks. See e.g., Schaffer v. Weast, 546 U.S. 49, 51 (2005).

Our conclusion is consistent with the language we highlighted from our opinion in K.D., wherein we specifically referred to a committee "mov[ing]" to challenge his treatment and the State "meet[ing] this challenge." Moreover, our conclusion comports with the plain language of the SVPA. Stated differently, the SVPA imposes a burden on the State to annually demonstrate, by clear and convincing evidence, the need for a person's "involuntary commitment as a sexually violent predator," N.J.S.A. 30:4-27.32(a). It does not require the State to establish the committee's appropriate treatment phase should the committee elect to contest an existing treatment phase.

Our determination that T.K. bears the burden to show why he is entitled to a modification of his treatment phase also finds support from an analogous discussion in In re Civ. Commitment of V.A., 357 N.J. Super. 55, 64 (App. Div.

2003),[7] wherein we "envision[ed] a comprehensive treatment program in which the restraints on individual liberties associated with institutional confinement are gradually relaxed, eventually leading to outright release into the community." As we noted in V.A., it is "the committee [who] must demonstrate successful adjustment to successive reductions of restrictions within the structured environment of a secured facility as a prerequisite to consideration for a conditional release." Ibid. (emphasis added).

Also, by way of further analogy, in State v. Fields, 77 N.J. 282, 303-04 (1978), where a committee was found not guilty by reason of insanity (NGI), the Court explained that although a commitment review hearing allows for the determination of the level of restraint on the liberty of the committee, the "committee remains free to challenge the propriety of those restraints at any time." Importantly, the Court noted, "[a]t any such committee-initiated review proceeding, the burden of proof is on the committee. As the moving party, the committee must demonstrate by a preponderance of the evidence that under the applicable criteria his request for the modification . . . of those restraints . . . should be granted." Ibid. (emphasis added) (citations omitted). Notably, we previously recognized that "NGI committees have a similar status to civil

_____

[7] V.A. was decided one day prior to K.D., in January 2003.

16                                                        A-0306-21

committees before the law." Matter of Commitment of Calu, 301 N.J. Super. 20, 25 (App. Div. 1997) (citing In re Commitment of Edward S., 118 N.J. 118, 125 (1990)).

Therefore, regarding the standard of proof to be utilized by a trial court hearing a committee's application for the modification of a treatment phase, we are persuaded the judge here correctly found T.K. had the burden of showing his entitlement to a phase promotion under a preponderance of the evidence standard. As our Court recently confirmed, "[t]he preponderance of the evidence standard is the least difficult standard of proof to vault," N.J. Div. of Child Prot. & Permanency v. J.R.-R., 248 N.J. 353, 376 (2021), and in a civil proceeding, a movant's burden of proof is generally by a preponderance of evidence, see Liberty Mut. Ins. Co. v. Land, 186 N.J. 163, 169 (2006); see also N.J.R.E. 101(b)(1).

We also agree with the judge that T.K. failed to meet his burden in establishing by a preponderance of evidence he should be promoted to Phase 3A. Indeed, the judge's finding was amply supported by competent evidence in the record. As the judge noted, Dr. Mandani credibly testified T.K. needed to remain in Phase 2 of treatment, given his fluctuating motivation to participate and engage in treatment, and she credibly opined T.K.'s "behavior . . . over the

last several years demonstrates that he is not utilizing the concepts that he's learned over the years. He's not able to integrate them, not able to utilize them."

Although both Drs. Mandani and Lorah were deemed credible by the judge, the judge gave greater weight to Dr. Mandani's testimony, noting she had "greater familiarity with [T.K.] as well as a greater familiarity with the programs offered by the STU" and was able to "set[] forth the more logical, better suited treatment plan for [T.K.]" Contrary to T.K.'s argument that "[t]he record is completely silent on the relative familiarity" of either Dr. Lorah or Dr. Mandani with T.K., Dr. Mandani's report and her testimony show that as a member of the TPRC, she not only interviewed T.K. before issuing her report, but consulted with his treatment providers, was familiar with his treatment history, and understood what programs were offered to T.K. as a resident of the STU. Under these circumstances and given the judge's expertise and ability to observe the expert witnesses, the judge's credibility and factual findings are entitled to our deference.

Lastly, we address T.K.'s argument the judge committed reversible error by citing to one of our unpublished opinions when finding T.K. bore the burden of proving by a preponderance of the evidence that he should be promoted to Phase 3A.

Rule 1:36-3 provides that "except to the extent required by res judicata, collateral estoppel, the single controversy doctrine or any other similar principle of law, no unpublished opinion shall be cited by any court." Therefore, the judge's reference to our unpublished case was not authorized by the Rules. But based on the standards we outlined in K.D. and those set forth in other cases we have cited, and considering the judge's acknowledgment the unpublished opinion was "an unreported decision" that was distinguishable from the instant case, defendant does not demonstrate how he was harmed by the judge's fleeting reference to the unpublished case. Thus, we deem the judge's errant mention of the unpublished opinion to be harmless error.

To the extent we have not addressed any remaining arguments raised by T.K., we are satisfied they lack sufficient merit to warrant discussion in this opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

19

A-0306-21